**ROCKWOOD COMPUTER CORPORATION,**
Plaintiff,

v.

**Gerald MORRIS, Defendant and Third-Party Plaintiff,**

v.

**Jerry YANDELL and Arthur Miller, Third-Party Defendants.**

No. 81 Civ. 1775.

United States District Court, E. D. New York.

March 17, 1982.

Layton & Sherman, New York City, for plaintiff.

Groman & Wolf, P. C., Mineola, N. Y., for defendant-third party plaintiff.

Jerry Yandell, pro se.

Arthur Miller, pro se.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

In this diversity case Rockwood Computer Corporation ("Rockwood") sues a former President of the Company, Gerald Morris, alleging breach of fiduciary duty. The amended complaint, filed on October 6, 1981, describes a scheme in which Morris conspired with two other executives, Jerry Yandell and Arthur Miller, to personally retain commissions and finders' fees derived from the sale of equipment owned by Rockwood. The alleged scheme was accomplished by receiving payment from purchasers in part by check and in part in cash. The amount paid by check would be reported to the Company as the full purchase price, and the cash would be divided among the three co-conspirators. This scheme allegedly began in late May 1980, after rumors started to circulate that Rockwood was about to be sold by its parent company. The complaint alleges that Rockwood had no notice of the defendant's disloyal conduct until August 6, 1980, but that the scheme ended when Morris's employment was terminated without cause on June 30, 1980.

On the basis of these factual allegations the complaint in Count I alleges that this conduct amounted to a breach of Morris's fiduciary duty to the Company. In Count II the complaint alleges that this conduct violated the standards of conduct set forth in a policy statement of Rockwood respecting conflicts of interest. As to these counts, the plaintiff seeks to recover a total of approximately $60,000 paid to Morris as salary during the alleged disloyal period,

and as severance and vacation pay upon the termination of his employment. The plaintiff also seeks $250,000 in punitive damages.

In Counts III and IV of the complaint the plaintiff alleges that on May 4, 1981, the defendant conveyed his interest in his residence to his wife without fair consideration, in order to avoid liability for the judgment that might be rendered here. The plaintiff seeks to set aside this transfer in Count III as a fraudulent conveyance under § 273–a of the N.Y. Debtor and Creditor Law, and in Count IV as a fraudulent conveyance under § 276 of the N.Y. Debtor and Creditor Law.

The defendant's answer denies the allegations in the complaint, and alleges as an affirmative defense that the plaintiff corporation issued the defendant a general release, dated July 1, 1980, upon the termination of his employment. The defendant also filed a third-party complaint against Yandell and Miller, the alleged co-conspirators, demanding indemnity or contribution in the event the plaintiff should ultimately prevail.

The plaintiff now moves for summary judgment dismissing the defendant's affirmative defense of general release and granting the plaintiff the affirmative relief requested in the complaint. The defendant cross-moves for summary judgment dismissing the complaint based on the affirmative defense of general release. Because the Court finds that there are genuine issues of material fact that must be determined as to both motions, the cross-motions are denied. Fed.R.Civ.P. 56(c).

Looking first at the plaintiff's motion for summary judgment as to its affirmative claims, it is clear that material issues of fact exist. The plaintiff's complaint charges the defendant with defrauding the company, and the plaintiff now submits affidavits from Yandell and Miller supporting these allegations. While the general denial contained in the defendant's answer would not be sufficient to raise issues of fact so as to withstand this summary judgment motion, Fed.R.Civ.P. 56(e),

here the defendant has submitted an affidavit controverting the charges of the plaintiff. The defendant's affidavit states that it was not until April 17, 1981, that he "became aware of the scheme of self-dealing perpetuated by Yandell and Miller." Morris Affidavit ¶ 10. This allegation controverts the entire substance of the plaintiff's claim, and thus is sufficient to raise genuine issues of material fact so as to preclude a summary judgment ruling.

The plaintiff argues that it is nonetheless entitled to summary judgment because the defendant took the Fifth Amendment at a deposition and did not controvert the plaintiff's charges of complicity in the kickback scheme. The plaintiff's reasoning is as follows:

> "Since Morris has, when he was given the opportunity to do so, failed to controvert under oath the facts brought forward by plaintiff, it is doubtful that there can be any '. . . genuine issue as to any material fact' and summary judgment should be granted." Plaintiff's Brief at 19.

For the following reasons, this argument is rejected.

Under Fed.R.Civ.P. 26(b), the scope of discovery is limited to "any matter, *not privileged*, which is relevant to the subject matter involved in the pending action" (emphasis added). Numerous cases have held, pursuant to this provision, that a deponent in a civil action may properly invoke the privilege against self-incrimination and that the court is without power to compel answers or to impose sanctions for failing to answer under Fed.R.Civ.P. 37. For example, in *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084 (5th Cir. 1979), the court stated:

> "Because [the defendant] had no right to information protected by the privilege against self-incrimination, [the plaintiff] did not violate the discovery rules when he declined to answer the questions posed at his deposition. In short, the district court had no authority to order [the plaintiff] to disclose privileged information and, consequently, should not have imposed sanctions when [the plaintiff] declined to answer."

*Id.* at 1087. *Accord, Campbell v. Gerrans*, 592 F.2d 1054 (9th Cir. 1979); *Justice v. Laudermilch*, 78 F.R.D. 201 (M.D.Pa.1978); *Hughes Tool Co. v. Meier*, 489 F.Supp. 354 (C.D.Utah 1977); *Priebe v. World Ventures, Inc.*, 407 F.Supp. 1244 (C.D.Cal.1976); *Dienstag v. Bronsen*, 49 F.R.D. 327 (S.D.N.Y. 1970); 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2018 (1970).

The rule enunciated in these cases is premised not only on the language of the Federal Rules, but on the Fifth Amendment itself. The Supreme Court has long held that the protection against self-incrimination may be asserted "in any proceeding, civil or criminal." *Kastigar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). Further, the court has prohibited "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). Thus, the imposition of sanctions under Rule 37 for the proper invocation of the Fifth Amendment during discovery would have constitutional implications. *See* 8 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2018 (1970).

Although the instant motion is not technically one for sanctions under Rule 37, the rationale of these cases is clearly applicable here. As stated in 8 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2018, at 148 (1970):

> "To dismiss a party's action, *or to grant judgment against him*, or to foreclose him from litigating an issue properly in the case, merely because he has claimed his constitutional privilege certainly makes the resort to the privilege 'costly'" (emphasis supplied).

This reasoning was applied in *Wehling v. Columbia Broadcasting System, supra*, to reverse the district court's dismissal of a plaintiff's action because of his refusal to answer questions posed at a deposition. The Fifth Circuit reasoned:

> "[W]e believe that dismissing a plaintiff's action with prejudice solely because he exercises his privilege against self-incrim-

ination is constitutionally impermissible. [The plaintiff] had, in addition to his Fifth Amendment right to silence, a due process right to a judicial determination of his civil action. When the district court ordered [the plaintiff] to answer [the defendant's] questions or suffer dismissal, it forced plaintiff to choose between his silence and his lawsuit. The Supreme Court has disapproved of procedures which require a party to surrender one constitutional right in order to assert another. *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Similarly, the Court has emphasized that a party claiming the Fifth Amendment privilege should suffer no penalty for his silence." 608 F.2d at 1087–88.

*Accord, Black Panther Party v. Smith*, 661 F.2d 1243 (D.C.Cir.1981); *Campbell v. Gerrans*, 592 F.2d 1054 (9th Cir. 1979).

■ Just as the Fifth Amendment precludes the dismissal of a plaintiff's complaint solely on the basis of his having invoked the privilege against self-incrimination at a deposition, so it must prohibit the granting of summary judgment against a defendant who has asserted the same privilege. Such relief would impose a significant cost for the defendant's silence, and as such would run afoul of the constitutional protection.[1]

The cases cited by the plaintiff in support of its argument do not dictate a contrary result. *Bilokumsky v. Tod*, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923), and *Sahn v. Pagano*, 302 F.2d 629 (2d Cir.) *cert. denied*, 371 U.S. 819, 83 S.Ct. 34, 9 L.Ed.2d 59 (1962), are both inapposite in that they involved the question of whether the trier of fact could draw an inference from the assertion of the Fifth Amendment in a civil proceeding. The Supreme Court subse-

quent to these cases expressly held that such an inference was permissible. *See Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.").

While this inference involves the imposition of some cost for invoking the privilege against self-incrimination, this penalty is far less severe than that called for by the relief requested here. In fact, the Supreme Court was careful to limit *Baxter* in *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). *Lefkowitz* involved the invalidation of a New York statute terminating a public official's term of office if he refused to testify regarding his conduct in office when subpoenaed by a grand jury or other authorized tribunal. The court distinguished *Baxter* by stating:

"*Baxter* did no more than permit an inference to be drawn in a civil case from a party's refusal to testify. Respondent's silence in *Baxter* was only one of a number of factors to be considered by the finder of fact in assessing a penalty, and was given no more probative value than the facts of the case warranted; here, refusal to waive the Fifth Amendment privilege leads automatically and without more to the imposition of sanctions." 431 U.S. at 808 n.5, 97 S.Ct. at 2137.

■ Since the relief sought here would exceed that sanctioned in *Baxter*, the plaintiff's argument predicated on the defendant's assertion of the Fifth Amendment is rejected. Because the defendant's affidavit has raised genuine issues of fact, the plaintiff's motion for summary judgment must be denied.[2]

---

1. This reasoning applies as well to the plaintiff's argument that the defense of release should be dismissed because of the defendant's silence at his deposition. Again, such relief would impose a significant cost for the invocation of the privilege, and as such, would be constitutionally impermissible. While the court in *Wehling* did indicate that a situation might arise wherein the prejudice caused by

the invocation of the privilege was so great that dismissal was justified "as a last resort," 608 F.2d at 1087, the circumstances of this case do not justify such a result. *But see Rubinstein v. Kleven*, 150 F.Supp. 47 (D.Mass.1957).

2. This conclusion applies to the plaintiff's request to set aside the conveyance of the defendant's house as well. The defendant's affi-

Turning to the question of the effect of the general release, it is not disputed that a general release was entered into by Rockwood after the time of the alleged fraudulent transactions, upon the termination of Morris's employment. The plaintiff argues, however, that under New York law[3] the release does not insulate Morris from liability for breach of fiduciary duty to disclose to Rockwood. The plaintiff recites in the affidavit of Martin Karnoff, the current Executive Vice President of Rockwood, that Rockwood would not have entered into the release if it had been aware of Morris's disloyal conduct.

As the following cases demonstrate, under New York law it is clear that if the plaintiff had no knowledge of the defendant's fraud when it entered into the release, the existence of the release would not insulate the defendant from liability on the plaintiff's claim for breach of fiduciary duty. Because genuine issues of fact remain regarding the fraud, however, summary judgment for either party on this ground is precluded.

In *Auld v. Estridge*, 86 Misc.2d 895, 382 N.Y.S.2d 897 (Sup.Ct.Nassau County 1976), *aff'd* 58 A.D.2d 636, 395 N.Y.S.2d 969 (2d Dept. 1977), the plaintiff and defendant had been partners in a business venture. Upon liquidating the partnership, the defendant failed to disclose to the plaintiff all he had received in return for partnership assets, and as a result was able to retain more than his fair share. After the distribution had been agreed to, the plaintiff executed a general release in favor of the defendant. Upon learning of the defendant's fraud, the plaintiff brought suit for breach of fiduciary duty and the defendant asserted the general release as a bar to the action. The court rejected this defense, however, stating: "[The defendant] could not, consistent with his fiduciary obligations, have exacted this release without giving [the plaintiff]

the details of the sale of the business. The release is invalid, then, to the extent that it purports to insulate [the defendant] from liability for breach of fiduciary duty." *Id.* at 906.

The defendant in the instant case seeks to distinguish *Auld* on the basis that the defendant there had solicited the release from the plaintiff. Here, the defendant argues, *Auld* is not controlling because Rockwood itself requested Morris to enter into mutual releases as part of a planned sale of the Company. Other New York authority, however, indicates that this factor of active solicitation for the release is not a necessary element in order to void the release's effect when pursuing a claim for breach of fiduciary duty to disclose.

For example, in *Federbush v. Federbush*, 88 N.Y.S.2d 185 (Sup.Ct.N.Y.County 1949), the defendant had misappropriated funds while an officer and stockholder of a corporation. When he sold his shares of stock he received a general release from all of the other stockholders of the corporation, including the plaintiff. The plaintiff later learned of the defendant's fraud and brought a derivative suit for the return of the misappropriated funds. The defendant raised the release as a defense, but this argument was rejected by the court. The court reasoned as follows:

"A fiduciary who furnishes his cestui with a full and fair statement of what he has done and requests approval or disapproval thereof may get a release which will prevent the cestui who approves from thereafter questioning the acts so approved. But in the absence of proof that a cestui has been given full information as to what the fiduciary has done and apprised of his or her rights in the matter, a release given by a cestui to a fiduciary is not effective to prevent the cestui from holding the fiduciary liable for wrongdoing." *Id.* at 191 (citations omitted).

davit raises two questions of fact that must be resolved in this regard. First, as discussed above, it is not yet clear that the plaintiff is indeed a creditor of the defendant. Second, the defendant asserts that he did not have a fraud-

ulent intent in transferring the house. These questions of fact preclude summary judgment.

**3.** Both parties have briefed this case under New York substantive law.

Strikingly similar to the instant case is *Insurance Co. of North America v. Whitlock*, 216 A.D. 78, 214 N.Y.S. 697 (1st Dept. 1926). In that case the defendants were employed as agents of the plaintiff and were charged with the responsibility of directing the plaintiff's business in New York. During the course of this agency the defendants misappropriated funds by understating amounts that had been collected on the plaintiff's behalf. This fact went undiscovered until after the termination of the agency and until after a general release in favor of the defendants had been signed. The Court rejected the defendants' argument that this release established a bar to the plaintiff's action, concluding that the release was invalid for fraud. The court stated:

> "Since, as noted, the defendants bore a fiduciary relationship to the plaintiff, there was a duty upon the defendants to disclose to the plaintiff all material facts connected with the matters in charge of the defendants. Not only was there a failure ... so to do, but there was an actual suppression by affirmative action of certain facts." *Id.* 214 N.Y.S. at 703.

*See also Adair v. Brimmer*, 74 N.Y. 539, 553–4 (1878); 49 N.Y.Jur., Release § 17 (1966).

On the basis of these authorities, it is clear that if the plaintiff's allegations of wrongdoing and non-disclosure are borne out, the release executed by the corporation will not constitute a bar to this action. The fact remains, however, as stated above, that genuine issues of material fact remain as to the plaintiff's allegations of fraud. Until such time as the alleged fraud is established, a judgment dismissing the defense would be premature.

So Ordered.