**JOINT VENTURE ASSET ACQUISITION,**
Plaintiff,

v.

**Michael J. ZELLNER, Joseph Krader, Zellner Plastering Co., Inc. and James R. Wilcox, Defendants and Plaintiffs on Counterclaims,**

v.

**INTERDISCOUNT SERVICES, LTD., Tara K. Cole, First California Lessors Corp. and Gene Lobato, Additional Defendants on Counterclaims.**

Nos. 87 Civ. 6102 (RWS), 87 Civ. 6100 (RWS), 87 Civ. 6081 (RWS) and 87 Civ. 6353 (RWS).

United States District Court, S.D. New York.

Nov. 23, 1992.

As Amended Dec. 4, 1992.

Shustak Jalil Sanders & Heller (Gayle S. Sanders, of counsel), New York City, for plaintiff.

Richard I. Wolff, P.C. (Richard I. Wolff, of counsel), New York City, for defendants/counterclaimants.

## OPINION

SWEET, District Judge.

The plaintiff Joint Venture Asset Acquisition ("JVAA") seeks to enforce promissory notes in favor of First City National Bank and Trust Company ("First City") (the "Notes") against the defendants and counterclaimants Michael J. Zellner ("Zellner"), Joseph Krader ("Krader"), Zellner Plastering Co., Inc. ("ZPCI"), and James R. Wilcox ("Wilcox"). After a bench trial and upon the following findings and conclusions, the amended complaint will be dismissed.

*The Parties*

First City had offices in New York City and its principal officers and majority stockholders were two brothers, A. Frederick Greenberg and Richard Greenberg (the "Greenbergs"), who founded First City. Neither of the Greenbergs had prior banking experience. First City at its inception in October 1985 was incorporated as a savings and loan association known as First City Federal Savings Bank with a capitalization of $3 million. Its purpose was to make loans to borrowers with high net worth to enable the borrowers to invest in limited partnerships. First City utilized a network of brokers to that end and in the first year of its operation 70–75% of the loans it made were utilized to make investments in limited partnerships. During the first year three or four limited partnerships were financed by First City.

In 1986 First City became a national bank and known as First City National Bank and Trust Company and on or about December 20, 1989 the Comptroller of the Currency declared First City insolvent, and appointed the Federal Deposit Insurance Corporation (the "FDIC") as Receiver.

JVAA, in which the Greenbergs have an interest and whose general partner Stanley Abel ("Abel") was a former director and shareholder of First City, acquired its interest in the Notes by a Memorandum Agreement dated April 7, 1988 and in 1989 JVAA acquired the Notes.

Zellner and Krader are California residents and co-owners of ZPCI. Zellner was the founder and principal administrator, and Krader the outside man. Both immigrated from Eastern Europe and together built ZPCI into a successful million dollar enterprise. Wilcox is a registered representative and a Nevada resident.

The Defendants obtained loans from First City in 1986 in order to invest in a tax-advantaged limited partnership known as Beam Systems Income Fund I ("Beam"), which purported to involve high technology digital facsimile document transmission equipment.

*Prior Proceedings*

After learning that the proceeds from the Notes never reached Beam, the Defendants refused payment on the Notes. In August and September 1987, First City sued the Defendants to recover unpaid principal and interest accrued on the Notes, together with the costs of collection, including attorneys' fees. Counterclaims were filed in February 1988. An amended complaint and amended counterclaims were subsequently served. The cases were consolidated in February 1989.

In September 1989, First City moved for summary judgment. In December 1989 the Comptroller of the Currency declared First City insolvent, and the FDIC was appointed as Receiver. On December 22, 1989, the Honorable Vincent L. Broderick signed an order staying all actions and proceedings in the Southern District of New York involving First City, including these actions.

The stay expired on April 25, 1990. Prior to that date, upon payments by JVAA, the FDIC and JVAA entered into an agreement under which FDIC acknowledged that JVAA had assumed First City's rights in a number of defaulted loans, including those at issue here and would intervene in all pending actions to seek enforcement. JVAA intervened in this litigation by stipulation on August 14, 1990. In the stipulation, JVAA claimed whatever holder in due course status First City previously enjoyed.

Oral argument was heard on JVAA's renewed motion for summary judgment on September 26, 1991. By opinion dated January 14, 1992, this court denied the motion, concluding that there were genuine issues of fact as to the extent, if any, of First City's "actual knowledge of some fact which would prevent a commercially honest

individual from accepting the Notes." 782 F.Supp. 232

The trial commenced on June 10, 1992, continued on June 11, 16, 17, and 18, 1992, and concluded on June 25, 1992. Final submissions were filed by agreement of the parties on October 30, 1992, at which time the action was considered finally submitted.

### The Issue

This case is but one of many involving failed and fraudulent limited partnerships financed by First City in the decade of the eighties.[1] The issue framed for trial was set forth in the denial of the JVAA motion for summary judgment as set forth above.

Because the officers of First City had knowledge of the purpose of the Notes and uncertainty concerning the propriety of the payment of the proceeds, First City was not a holder in due course. The Defendants were defrauded, their claim for fraud was not waived, and judgment will be entered dismissing the amended complaint with costs.

### The Facts

Zellner and Krader from time to time prior to the end of 1985 had purchased limited partnerships at the suggestion of their accountant. In late 1985 the accoun-

1. JVAA brought separate actions against sixteen individual investors that were consolidated under a single caption. *See Joint Venture Asset Acquisition v. Bhogaonker,* Nos. 87 Civ. 5308, 87 Civ. 5323 (RWS), 87 Civ. 5331 (RWS), 87 Civ. 5332 (RWS), 87 Civ. 5333 (RWS), 87 Civ. 5334 (RWS), 87 Civ. 5337 (RWS), 87 Civ. 5339 (RWS), 87 Civ. 5341 (RWS), 87 Civ. 5342 (RWS), 87 Civ. 5343 (RWS), 87 Civ. 5390 (RWS), 87 Civ. 7431 (RWS), 87 Civ. 7687 (RWS), 87 Civ. 8534 (RWS), 88 Civ. 0914 (RWS), 1992 WL 8357, 1992 U.S.Dist. LEXIS 267 (Jan. 15, 1992).

First City has brought actions against numerous individual investors and limited partnerships. *See Thornock v. Kinderhill Corp.,* 749 F.Supp. 513 (S.D.N.Y.1990) (consolidating six cases in which First City was plaintiff); *First City Fed. Sav. Bank v. Margolin,* No. 88 Civ. 8512 (CSH), 1990 WL 58881, 1990 U.S.Dist. LEXIS 5204 (S.D.N.Y. May 1, 1990); *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76 (2d Cir.1989); *First City Nat'l Bank & Trust Co. v. Moody,* No. 88 Civ. 3116 (KTD), 1988 U.S.Dist. LEXIS 16741 (S.D.N.Y. Sept. 30, 1988), *aff'd sub nom. First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76 (2d Cir.1989); *First City Fed.*

*Sav. Bank v. Dennis,* 680 F.Supp. 579 (S.D.N.Y. 1988) (consolidating twelve actions against investors); *First City Nat'l Bank & Trust Co. v. Zuckerman,* 682 F.Supp. 182 (S.D.N.Y.1987); *First City Nat'l Bank & Trust Co. v. Heaton,* 165 A.D.2d 710, 563 N.Y.S.2d 783 (1st Dep't 1990); *First City Nat'l Bank & Trust Co. v. Tobias,* 156 A.D.2d 267, 548 N.Y.S.2d 655 (1st Dep't 1989).

Several individual investors have filed actions against First city and against JVAA as the receiver of First City. *See Haberkamp v. Steele,* No. 90 Civ. 1383 (CSH), 1992 WL 84544 1992 U.S.Dist. LEXIS 4917 (S.D.N.Y. Apr. 15, 1992); *Krauss v. Federal Deposit Ins. Corp.,* 769 F.Supp. 519 (S.D.N.Y.1991); *Thornock,* 749 F.Supp. 513; *Tobias v. First City Nat'l Bank & Trust Co.,* 709 F.Supp. 1266 (S.D.N.Y.1989).

Other actions involving First City and its demise include the following: *Greenberg v. Comptroller of Currency,* 938 F.2d 8 (2d Cir.1991); *In re First City Nat'l Bank & Trust Co.,* 759 F.Supp. 1048 (S.D.N.Y.1991); *First City Nat'l Bank & Trust Co. v. Federal Deposit Ins. Co.,* 730 F.Supp. 501 (E.D.N.Y.1990); *Bruce v. Martin,* Nos. 87 Civ. 7737 (RWS), 88 Civ. 3978 (RWS), 1990 WL 52180, 1990 U.S.Dist. LEXIS 4198 (S.D.N.Y. Apr. 13, 1990).

tant suggested meeting with Richard McNamee ("McNamee") and Tom Devaney ("Devaney"), officers of MPA Associates, Inc. ("MPA"), who were seeking investors in the Beam limited partnerships.

Beam was described as being in the business of developing and operating high technology facsimile document transmission equipment. At a December 30, 1985 meeting, Devaney was introduced as the CEO of MPA who was to be Beam's managing agent.

According to Devaney, Beam's financing was in place, the fax machines to be installed in hotels were in service, only a few units were left, and they wanted to "get rid of them." Zellner and Krader decided to invest that day.

Gene Lobato ("Lobato") arrived the following day, December 31, 1985, to loan Zellner and Krader one-half of the down payment on their investment using the names of First Cal Leasing d/b/a First California Lessors Corp. Zellner, Krader, and ZPCI purchased interests in Beam on the basis of the Private Placement Memorandum ("PPM").

Zellner and Krader made their investment decisions in reliance on the representations of officials of MPA, the promoter/manager of Beam, and on the additional representations of Lobato that (i) Beam had equipment already in service at major hotel locations; (ii) the unpaid portion of the purchase price on their investment would be paid off out of the operating revenues of Beam; and (iii) in the highly unlikely event that this revenue stream was insufficient to pay off the unpaid portion of the purchase price, MPA guaranteed making the payment.

Zellner and Krader each purchased 5 units and ZPCI each purchased 10 units of Beam. The purchase price per unit was approximately $10,000, of which approximately $1,300 was made as an initial payment with the obligation to pay the unpaid portion formalized by a subscription/assumption agreement. The investment was structured so that the investors would obtain certain tax benefits.

InterDiscount Services, Ltd. ("InterDiscount"), a presently defunct corporation, had been retained by Beam to provide financing. InterDiscount, the shares of which were held 50% by Tara Cole ("Cole") and 50% by Gideon Chern ("Chern"), sought to arrange financing for Beam. Cole had been introduced by John Rice.

Cole met the Greenbergs in January 1986 or at the very end of 1985 through another broker, John Rice ("Rice"). The Greenbergs first introduced Cole to Michael Cash ("Cash") as the person managing National Capital Corp. ("NCC") and the business of First City and InterDiscount was described. The documents were to be forwarded to NCC which Cole believed to be owned by First City. Cash was president of NCC and Harvey Hirschfeld ("Hirschfeld") its executive vice president. The office of NCC was within the suite 1101 at 60 Madison Avenue, in New York, maintained by the Greenbergs, the phones were answered "Executive Offices," and First City and NCC shared telex and cable designations. NCC paid no rent. There was no listing to NCC or its officers on any director or door at 60 Madison Avenue. First City prepared the forms for transaction which were distributed by NCC and Greenberg participated in the preparation of the financial grid and guidelines which NCC used in reviewing the applications to be submitted to First City. NCC paid First City an origination fee on loans made by it processed by NCC. Greenberg told Cole that First City's agent, NCC, reviewed the offering memorandums and checked out the syndicators. Hirschfeld testified that he had read the Beam offering memorandum and it was available for anyone at NCC to review. First City agreed to make $4.8 million available to qualified investors and introduced by InterDiscount. Cole was advised that NCC was responsible for assembling and evaluating the paper work on these loans, reviewing the offering memorandums and checking the syndicators.

A second meeting was then held prior to January 13, 1986 at which Cole, the Greenbergs, Cash and Rice were present and the contents of NCC's letter of January 13,

1986 to InterDiscount were discussed at length by the participants and agreed upon.

The second paragraph of this letter provides, in part:

Interest received by the Lender [*i.e.*, First City] in excess of 1% over the Reference Rate up to a maximum of 3% per annum over the Reference Rate will be disbursed to IDSL on a monthly basis.

At this meeting it was concluded that NCC would supply the forms prepared by First City to InterDiscount for distribution to the prospective borrowers, including Promissory Notes, Borrowers Letters, Engagement and Authorization Letters, and Irrevocable Instructions To Pay Proceeds Letters.

Cole wrote on March 24, 1986 to Hirschfeld stating:

Enclosed please find an adjusted transaction outline for Beam. Please note that the rate is 14%. Richard and I agree that First City would accept 13½%. The ½% of a percentage differential should be deposited in InterDiscount Services Ltd.'s account after collection on a quarterly basis.

confirming a telephone conversation with Greenberg.

After investing, Zellner asked if he could view the system in operation and learned that the system was not functioning and financing had been delayed. Lobato and McNamee came to Zellner's office on April 1, 1986, appropriately enough stressing the need for immediate action and requesting Zellner, Krader, and ZPCI to execute notes and a Borrowers Letter.

By the terms of the Notes, Zellner and Krader agreed to pay the principal sum of the Notes in equal quarterly installments, together with interest which was in blank, and upon default to pay any amount due thereunder when the entire amount of the Notes would become due and payable without notice or demand. The Defendants also agreed to waive the right to interpose any set-off or counterclaim in any action brought under the Notes. The Notes also provided that the Defendants reimburse the Bank for all costs and expenses, including reasonable attorneys' fees and dis-

bursements, incurred by the Bank in connection with the enforcement of the Defendants' obligations thereunder.

The Borrowers Letters executed on April 1 instructed the bank, which was not identified, to pay the proceeds of their loans directly to InterDiscount Services Ltd. ("InterDiscount"). The Borrowers Letters also provided that the bank was acting solely as a lender and not as an investment advisor, that the bank had made no representations to the Defendants to induce them to request their loans, and that the bank had made no representations concerning the partnership, its general partner, or its financial strength, prospects or integrity. The Borrowers Letter held the bank harmless, released it from any and all claims.

The Defendants signed the Irrevocable Instructions To Pay Proceeds Letter as part of their loan documentation which provided that:

Please make the transfer [of the loan proceeds] when required and by wire charging me any cost. Please confirm the transfer [of the loan proceeds] to me by mail to my address as set forth in the enclosed loan application.

Only Wilcox received this written confirmation in a letter from First City dated April 23, 1986, the day after his loan application was approved.

First City's letter did not inform Wilcox that his loan proceeds had already been disbursed to First California, InterDiscount and NCC, pursuant to the Engagement and Authorization Letter.

Wilcox has an extensive securities and investment background, and had invested in numerous limited partnerships prior to Beam. He has been a registered representative since 1965, selling stocks and bonds with securities firms and in 1986 he also started marketing investment products. He has been employed in the securities industry for substantially all of his business career.

Wilcox first heard about Beam in November 1985 from Chuck Polley ("Polley"), a golfing friend. Before Wilcox executed a Beam subscription agreement at the end of

December 1985, he understood that all of Beam's equipment was supposed to be in service by the end of 1985 but did nothing to verify whether the Beam equipment actually was in service before he signed the Note which was identical to the Notes signed by Zellner and Krader. Again the Notes did not contain a stated interest rate nor identify the bank in whose favor the Note was executed.

Early in 1986, Wilcox learned that Beam's equipment was not in service at the end of 1985 and Polley told him that the partnership was trying to get third-party financing to purchase the equipment and place it in service.

In March 1986, Zellner, Krader, and Wilcox were told that they would have to obtain personal loans for their respective portions of the financing with the proceeds of their individual loans going directly to Beam.

Wilcox spoke with Lobato who represented himself as being the "lender's representative who would be orchestrating or arranging this replacement financing." Lobato informed him that "First City" was going to be the lender and that First City's official, Craig Staley ("Staley") was the person he "could contact" who was handling this situation. At this time Lobato also informed Wilcox that InterDiscount, whose name did appear in the Borrowers Letter and the Engagement and Authorization Letter, "was the disbursement arm of the bank, of the lender." On March 31, 1986, Wilcox met with Lobato and executed, among other documents, a Note, Borrowers Letter and Engagement and Authorization Letter in connection with his loan application. First City's name did not appear on any of the loan documentation.

In April 1986, Wilcox called Staley who was the chief lending officer at First City and confirmed with him that Lobato was representing First City, that InterDiscount was the disbursing arm of the bank and "that the equipment had been placed in service." Wilcox testified that if Staley

had not confirmed these specific matters that he "would have withdrawn my loan application."

On April 1, 1986, Lobato went to Zellner's office to obtain the same loan documentation (*i.e.*, Promissory Notes,[2] Borrowers Letters and Engagement and Authorization Letters, among other documents) from Zellner, Krader, and ZPCI. Zellner, as the inside man at ZPCI, was directly involved with arranging for the execution of the loan documentation. During this visit, Lobato told Zellner that InterDiscount was the "disbursement arm of the lender from whence he was going to get the loan."

The 14% and 16% interest rates now appearing on their respective Promissory Notes and Borrowers Letters were not inserted at the time of execution. At some time after the execution of the Promissory Notes and Borrowers Letters, the 14% and 16% interest rates were inserted.

Zellner, Krader, and Wilcox had no knowledge of the efforts to promote the Beam partnership beyond the conversations with their accountant, Lobato, Devaney and McNamee.

Hirschfeld wrote a proposed commitment letter dated March 25, 1986 to Cole in which he proposed, among other things, that "interest will be ... at a 14% fixed rate of interest." Cole rejected the proposed commitment letter and told Hirschfeld of that fact by phone on March 26, 1986 and marked such letter "cancelled" across its face.

At the outset the documents signed by Zellner, Krader, and Wilcox were turned over to Cole by Lobato and Devaney and then forwarded by Cole to First City which was to provide the financing.

Cole reached an understanding with Greenberg that a percentage of interest received by First City would be paid to InterDiscount. Although First City, NCC, Cole and InterDiscount agreed in writings dated January 13, 1986 between themselves

---

**2.** The Promissory Notes of Zellner, Krader and ZPCI are in the original amounts of $42,750, $42,750 and $85,500, respectively.

that the interest rate on the loans at issue would be made at 1% over the then prevailing reference rate charged by Manufacturers Hanover Trust Company ("MHTC"), at the time these loans were made during the period of April 22–July 3, 1986, MHTC's loan officer, Candela, testified that the reference rate being charged by MHTC was 8½%. Throughout this same time frame the prime rate, as set forth on the Federal Reserve statistical release, was also 8½%. Plainly, the inserted 14% and 16% interest rates were in excess of the agreed upon then prevailing MHTC reference rate of 8½% plus 1%—or 9½%—at the time First City's loan committee approved each of the loan applications.

Thereafter Hirschfeld communicated directly to Lobato and Devaney which Cole considered to be an effort to steal her clients. Lobato and Devaney then advised Cole that the proceeds of the loans were to be paid, not to Beam, but to First California Lessors.

The Engagement and Authorization Letter executed at the time of Lobato's visits on March 31 and April 1, 1986, states:

InterDiscount Services, Ltd.
641 Lexington Avenue
New York, N.Y. 10022
Gentlemen:
I (we) request your assistance in obtaining a loan for an investment in Beam Systems Income Fund I, a California limited partnership. I (we) understand and agree that the name of the lender has been omitted from all the loan documents I (we) have been asked to execute, including but not limited to my Promissory Note. This will serve as your authorization to insert the name of the lending institution, who will be granting the loan, when such determination is made.
Please allow this letter to serve as my (our) authorization to you or your designees to obtain consumer credit reports from consumer credit reporting agencies as part of your credit review process. You are also authorized to contact any reference I (we) have furnished to you in order to verify or obtain any additional information you may require.

I will irrevocably instruct the lender to pay the proceeds of my (our) loan directly to you. You are instructed to pay the proceeds to the order of Beam Systems Income Fund I.

Wilcox in early April 1986, after he had signed the Borrowers Letter called Craig Staley, senior lending officer of First City, seeking confirmation that Lobato was representing First City, that InterDiscount was the disbursing arm of the Bank, and that the equipment had been placed in service. Staley gave the requested assurances.

A second Engagement and Authorization Letter, apparently forged by Lobato ("Forged Engagement and Authorization Letter"), was presented to NCC directing payment to First California Lessors. Zellner, Krader, and Wilcox denied signing this letter and no evidence was offered to contradict their testimony.

Cole was told by Lobato and others of so-called "inconsistencies" in the Engagement and Authorization Letters that were already executed by the Defendants, and Cole prepared two different drafts of what became the Forged Engagement and Authorization Letter. Cole, by letter dated April 4, 1986, advised Lobato that:

I was unable to confirm the changes in the Engagement and Authorization Letters with the bank.... If this form is approved by the bank, then all investors will need to sign it as a substitution for the original one.

Cole, by letter dated April 7, 1986 to NCC, forwarded a draft of the Forged Engagement and Authorization Letter.

On either April 9 or 10, 1986, Cole had a telephone conversation with Greenberg, in which she told him that she did not want to proceed with the Beam Systems deal, that she wanted the papers back, that Harvey Hirschfeld was not responsive to her communications, that it was an untenable situation, and that she had not reviewed the Beam Systems project, that it was not her project, and that she did not want to go ahead with it and would not be responsible for it.

Cole also wrote a letter, dated April 10, 1986 to Cash at NCC, in which she said:

> After reviewing and considering all that is involved, I think it is best and would appreciate it very much if the original documents from the investors could be assembled and we could send our messenger to pick up those documents this afternoon.

Notwithstanding, the transaction went forward and Cole continued to participate in the distribution of the loan proceeds.

Cole was out of the office on April 17, 1986 and therefore never saw the purported executed originals of the Forged Engagement and Authorization Letters before Cole's secretary signed her name to the transmittal letter dated April 17, 1986, forwarding them to NCC.

At some point the 14% interest rate was added to the Notes and upon all the facts as found, it is inferred that it was agreed upon to resume the transaction with the difference between the commercial rate of 9½% and 14% being allocated between InterDiscount and First City, since there is no evidence of NCC's involvement in setting the interest rate beyond 9½%.

First City then approved the loan applications of Zellner, Krader, Wilcox and ZPCI. No notice of this approval was received by Zellner or Krader. Wilcox received a confirmation by letter of April 23 which stated in part:

> I am pleased to let you know that we have approved the $85,500.00 loan to finance your interest in Beam Systems Income Fund I Limited Partnership, and I cordially welcome you to First City Federal. The proceeds of this loan have been transferred according to your instructions.

The loan proceeds were disbursed in accordance with letters from Cole to Staley dated April 21, June 23, April 25, and July 3, respectively to Staley, 90% to First California at Queen City Bank, 5% to InterDiscount and 5% to DCC. Lobato, the president of First California and the sole signatory on its account at Queen City, spent the funds without crediting any funds to Beam.

Beginning in the summer and fall of 1986, First City sent out invoices and delinquent notices to the Defendants who contacted MPA about these developments and MPA made an interest payment of $4,422.05 to First City on behalf of Zellner, Krader, and ZPCI on December 18, 1986. During this period Wilcox continued to make payments while waiting for MPA to honor its guarantee. MPA wrote to the Defendants on October 10, 1986, stating:

> Per our conversation on October 10, 1986, please be advised that "we" (MPA et al) shall be paying all notes to the First City Federal Savings Bank for all concerned parties. The aggregate sum of all notes is $281,500. The bank has agreed not to contact any of our investors, nor will they report any adverse credit information.

MPA failed to honor this commitment.

In 1987 counsel for Zellner, Krader, and ZPCI sought documentation of the investment and the use of the proceeds. First City withheld this information.

The Board of Governors of the Federal Reserve System entered a Final Order of Prohibition, dated October 28, 1991, against Greenberg and his brother, A. Frederic Greenberg which, *inter alia*, prohibited them from "participating in the conduct of the affairs of any bank holding company, any insured depository institution or any other institution specified in subsection 8(e)(7)(A) of the Act...."

The United States Court of Appeals for the Second Circuit affirmed the Order of Prohibition. *See Greenberg v. Board of Governors of Fed. Reserve Sys.,* 968 F.2d 164 (2d Cir.1992) (with respect to the Board's finding of personal dishonesty). Richard Greenberg was the principal fact witness on behalf of First City.

Under the Notes, Zellner owes $39,188.00 in principal and $34,494.15 in accrued interest through May 15, 1992; Krader owes $42,750.00 in principal and $37,629.50 in accrued interest through May 15, 1992; Zellner Plastering owes $85,500.00 in principal and $75,259.00 in accrued interest through May 15, 1992; and that Wilcox owes $64,125.00 in principal and $55,974.00

in accrued interest through May 15, 1992. The legal fees and disbursements billed to the Bank and JVAA in connection with the lawsuits through May 31, 1992 total $158,792.66.

*First City Did Not Take The Notes For Value*

■ To qualify as a holder in due course, First City would have to satisfy the standards of UCC § 3–302(1), which provides:

(1) A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

UCC § 3–303(a) states that a holder takes "for value" when "the agreed consideration has been performed, or that he acquires a security interest in or a lien on the instrument otherwise than by legal process."

Here First City failed to perform the agreed consideration, first by failing to confirm the transfer of the loan proceeds as requested by the Irrevocable Instructions To Pay Proceeds Letter and by failing to comply with the instruction in the Borrowers Letter that the investment was "for an investment in Beam Systems Fund" and that InterDiscount was "instructed to pay the proceeds to the order of Beam Systems I."

As found above, Zellner, Krader, and ZPCI received no confirmation and Wilcox received a confirmation which was false in that the funds had not been transferred in accordance with Wilcox's instructions, but rather through InterDiscount to an entity, First California, which had previously been a stranger to the transaction. The transfer directed by Cole contained no indicia of any relationship to Beam.

First City in discharging its duties and responsibilities to the Defendants, had to comply with the agreement as a whole, including the Promissory Notes, Borrowers Letters and the Engagement and Authorization Letters which were all executed at the same time as part and parcel of the same transaction, *Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228 (2d Cir.1991).

The Borrowers Letters, standing alone, clearly provide that the loan proceeds are "for an investment in Beam Systems Income Fund I." Accordingly, the transfer of the loan proceeds without any indication of any transfer is contrary to the stated terms.

Based on the conversation and documents referred to above, Greenberg knew and acknowledged that the loan proceeds were for an investment in Beam, despite his testimony to the contrary.

At the very least, the Borrowers Letters created an ambiguity as to the intended final destination of the loan proceeds, which must be construed "strongly against" First City as its drafter as required by *Jacobson v. Sassower,* 66 N.Y.2d 991, 499 N.Y.S.2d 381, 489 N.E.2d 1283 (1985), where the Court of Appeals stated:

In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language.

66 N.Y.2d at 993, 499 N.Y.S.2d 381, 489 N.E.2d 1283. *Accord Arkwright–Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.,* 695 F.Supp. 156, 160 (S.D.N.Y.1988); *Prescott, Ball & Turben v. LTV Corp.,* 531 F.Supp. 213, 217 (S.D.N.Y.1981).

Further, of course, Hirschfeld, who was the second in command at NCC during the time of this transaction to which the Cole instructions were sent, stated that it was always his understanding that InterDiscount was to pay the loan proceeds over to Beam. NCC as set forth below was First City's agent.

These failures to provide value and confirmation, of course, strike at the heart of the relationship between First City and the Defendants. Had these failures not taken place, it is entirely possible that the consequences of the fraud committed on the Defendants could have been recouped in the spring of 1986.

*First City Did Not Act In Good Faith*

██ This was an early transaction for First City in the go-go days of 1985, one of but three or four it embarked upon. First City and Greenberg prepared the forms, talked with the selling broker and arranged for the compensation as well as the 14% interest rate which included an undisclosed return to First City. Further, Greenberg knew that in the course of the transaction the referring broker, Cole, sought to terminate the relationship citing inconsistencies. Greenberg was put on notice that the transaction was being altered.

In *Chemical Bank of Rochester v. Haskell*, 51 N.Y.2d 85, 432 N.Y.S.2d 478, 411 N.E.2d 1339 (1980), it was said:

> Thus, the inquiry is not whether a reasonable banker in Chemical's position would have known or would have inquired concerning the alleged breach by Stanndco of its partnership duties, but rather, the inquiry is what Chemical itself actually knew. If Chemical did not have actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments, then its good faith was sufficiently shown.

51 N.Y.2d at 92, 432 N.Y.S.2d 478, 411 N.E.2d 1339.

The term, "bad faith," has been defined as being "nothing less than guilty knowledge or willful ignorance." *Manufacturers & Traders Trust Co. v. Sapowitch*, 296 N.Y. 226, 230, 72 N.E.2d 166 (1947). *See also Corporacion Venezolana de Fomento v. Vintero Sales, Corp.*, 452 F.Supp. 1108, 1119 (S.D.N.Y.1978) ("bad faith" is "far more extreme than a failure to observe reasonable commercial standards or the standards of a reasonably prudent man"), *remanded on other grounds*, 607 F.2d 994 (2d Cir.1979).

Even after Cole's April conversations, Greenberg concedes that he was unaware of any document signed by the Defendants authorizing any portion of their loan proceeds to be paid to First California or NCC, or to be kept by InterDiscount. Greenberg stated that if a borrower had said, "I don't want to be a participant in this limited partnership, I have a smell about it; I don't like it," that the loan to fund the borrower's investment would not have been made. Yet, he permitted this transaction to go forward, even though the "smell" message was the substance of Cole's conversation with Greenberg on April 9 or 10, 1986. As in *Scarsdale Nat'l Bank & Trust Co. v. Toronto–Dominion Bank*, 533 F.Supp. 378 (S.D.N.Y.1982), the holder had not acted in good faith because of the surrounding circumstances.

First City, at the very least, after Cole's expression of reservation, admittedly failed to directly inquire of the Defendants if they wanted to proceed with the funding of their loans or how the loan proceeds were to be disbursed as part of a deliberate desire on its part to evade knowledge because of a belief or fear that investigation would disclose a defense arising from the transaction. *See Corporacion Venezolana de Fomento, supra*, at 1119; *see also Savings Banks Trust Co. v. Federal Reserve Bank*, 738 F.2d 573, 574 (2d Cir.1984) ("knowledge and disregard of suspicious circumstances are sufficient to vitiate an assertion of good faith where negotiable instruments are concerned"); *First City Federal Sav. Bank v. Bhogaonker*, 684 F.Supp. 793, 797 (S.D.N.Y.1988) ("Under [the] subjective standard, the existence of bad faith turns on whether the holder of the note knew that the transaction was suspect."); *Sundsvallsbanken v. Fondmetal, Inc.*, 624 F.Supp. 811, 818 (S.D.N.Y. 1985) ("notice of defenses against an instrument means actual subjective knowledge of defenses, and not the mere existence of suspicious circumstances"); *In re Frigitemp Corp.*, 34 B.R. 1000, 1013 (S.D.N.Y.1983), *aff'd*, 753 F.2d 230 (2d Cir. 1985) (bank that accords provisional credits suspecting customer is engaged in check kiting does not become a holder in due course).

*NCC Was An Agent For First City*

██ Under the facts found above, First City, in utilizing NCC to carry out the loan transactions, exerted its power to control the acts of NCC throughout this transaction. *See In re Shulman Transport En-*

*terprises, Inc.,* 744 F.2d 293, 295 (2d Cir. 1984); *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.,* 689 F.Supp. 1340, 1353 (S.D.N.Y.1988).

As in *Federal Sav. & Loan Ins. Corp. v. Quality Inns, Inc.,* 674 F.Supp. 522 (D.Md. 1987), *aff'd in part and vacated in part,* 876 F.2d 353 (4th Cir.1989), First City supplied NCC with all of the forms for execution and submission by the applicants and provided the financial grid and guidelines used in reviewing and analyzing their financial position, thereby creating an agency relationship.

First City is responsible for the acts of NCC, whether acting under either real or apparent authority. *See British American & Eastern Co. v. Wirth, Ltd.,* 592 F.2d 75, 80 (2d Cir.1979). It is estopped from denying the existence of such relationship because First City gave NCC all of the trappings of being a legitimate part of First City's operations. *See Fuller v. Fasig–Tipton Co.,* 587 F.2d 103, 107 (2d Cir.1978); *Hewett v. Marine Midland Bank, N.A.,* 86 A.D.2d 263, 270, 449 N.Y.S.2d 745 (2d Dep't 1982); *Bank v. Rebold,* 69 A.D.2d 481, 491, 419 N.Y.S.2d 135 (2d Dep't 1979).

In *Cullen v. BMW of North America, Inc.,* 490 F.Supp. 249 (E.D.N.Y.1980), it was said:

> On the other hand, the principle of agency by estoppel is colorably applicable. Although no actual agency relationship exists, such an agency may arise where the party charged as principal permits the putative agent to act in such manner that a reasonable man might infer that an agency relationship in fact existed. See Restatement of Agency § 8, comment (d) (1958); 2 N.Y. Jurisprudence, Agency §§ 25, 87. *See also S.S. Silberblatt, Inc. v. Seaboard Surety Co.,* 417 F.2d 1043, 1049 (8th Cir.1969). Agency by estoppel may arise if "the person sought to be charged intentionally or carelessly caused the plaintiff to believe in the authority of the purported agent." *Karavos Compania, etc. v. Atlantic Export Corp.,* 588 F.2d 1, 11 (2d Cir.1978).

490 F.Supp. at 253.

Of course, since the facts establish a failure of consideration known to NCC as

well as First City, NCC's status as agent deprives First City of its holder in due course status.

*The Defenses Of Lack Of Consideration And Failure Of Performance Defeat Enforcement Of The Notes*

■ UCC § 3–306 permits the Defendants to present the various defenses available to them to defeat the enforcement of the disputed Promissory Notes, stating:

> Unless he has the rights of a holder in due course any person takes the instrument subject to
>
> (a) all valid claims to it on the part of any person; and
>
> (b) all defenses of any party which would be available in an action on a simple contract; and
>
> (c) the defenses of want or failure of consideration, non-performance of any condition precedent, non-delivery, or delivery for a special purpose (Section 3–408); and
>
> (d) the defense that he or a person through whom he holds the instrument acquired it by theft, or that payment or satisfaction to such holder would be inconsistent with the terms of a restrictive indorsement.
>
> The claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party.

L.1962, c. 553.

In view of the conclusions earlier set forth, the Defendants may now assert all defenses which would be available to them "in an action on a simple contract" to specifically include "want or failure of consideration." *See Key Bank of Southeastern New York, N.A. v. Strober Bros., Inc.,* 136 A.D.2d 604, 607, 523 N.Y.S.2d 855 (2d Dep't 1988); *Fazio v. Loweth,* 112 A.D.2d 135, 137, 490 N.Y.S.2d 859 (2d Dep't 1985).

The "want or failure of consideration" has already been described above. In order for a contract to be enforceable there must be valid consideration. Here the Defendants never received what they bar-

gained for, a process resulting in all of their loan proceeds being transferred to Beam and no one else. *See Roth v. Isomed, Inc.,* 746 F.Supp. 316, 319 (S.D.N.Y.1990); *Banque Arabe Internationale et Internationale D'Investissement v. Bulk Oil (USA), Inc.,* 726 F.Supp. 1411, 1419 (S.D.N.Y.1989); *Weiss v. Salamone,* 116 A.D.2d 1009, 1010, 498 N.Y.S.2d 630 (4th Dep't 1986); *Stone v. Blizzard,* 137 Misc.2d 92, 93, 520 N.Y.S.2d 112 (1987).

Cases have held that "in order for fraudulent inducement to prevent enforcement of a promissory note, it generally must be based on misrepresentations concerning the terms or conditions of the loan itself." *Thornock v. Kinderhill Corp.,* 749 F.Supp. 513, 518 (S.D.N.Y.1990). The Defendants never saw or executed the Forged Engagement and Authorization Letter, apparently forged by Lobato.

Furthermore, when Staley confirmed to Wilcox in April of 1986 that Lobato was representing First City, that InterDiscount was the disbursing arm of the bank and that "the equipment had been placed in service," fraud in the inducement concerning the terms and conditions of the loan was established based on Wilcox's testimony that without Staley confirming these matters, he "would have withdrawn my loan application."

When Lobato was questioned by Zellner at the time he executed the loan documents on April 1, 1986, Zellner was also told by Lobato that InterDiscount was the disbursement arm of the bank, which gave him comfort for the safety of his loan proceeds and those of Krader and ZPCI.

In *Westbury Small Business Corporation v. Ballarine,* 125 A.D.2d 462, 509 N.Y.S.2d 569 (2d Dep't 1986), the Appellate Division affirmed the dismissal of plaintiff's action for recovery on a promissory note as the result of its fraudulent misrepresentation:

> We agree with the trial court's finding that the plaintiff and Power Test Petroleum Distributors, Inc. (hereinafter Power Test), are arms of each other, and that Power Test fraudulently misrepresented material facts to the defendant to induce

him to enter into a franchise agreement for a certain retail gasoline station. The record also indicates that Power Test knowingly failed to provide the defendant with the gallonage volume history and list of names and addresses of any dealers who operated the station during the previous three years as required under General Business Law § 199–b.

Power Test's failure to disclose and fraudulent misrepresentation not only vitiated the franchise agreement, but also the promissory note executed simultaneously as a part of the same transaction. As the plaintiff is indisputably not a holder in due course, the trial court properly dismissed its action for recovery on the promissory note.

125 A.D.2d at 462, 509 N.Y.S.2d 569. *See also, Millerton Agway Coop., Inc. v. Briarcliff Farms, Inc.,* 17 N.Y.2d 57, 61, 268 N.Y.S.2d 18, 21 (1966) (parol evidence of fraudulent misrepresentation is admissible to avoid agreement induced by such fraud); *Pan Atlantic Group, Inc. v. Isacsen,* 114 A.D.2d 1022, 495 N.Y.S.2d 458, 459 (2d Dep't 1985) ("[s]ince there is no contention by plaintiff that it held the note in due course, the defense of fraudulent inducement may be asserted against it"); *Westbury Small Business Corp. v. Giglio,* 122 A.D.2d 49, 504 N.Y.S.2d 683, 685 (2d Dep't 1986) (because plaintiff was not a holder in due course, defendant's defense of fraud against payment of a note to third party was also good against plaintiff); *Magi Communications, Inc. v. Jac–Lu Assoc.,* 65 A.D.2d 727, 410 N.Y.S.2d 297, 299 (1st Dep't 1978) (when complaint states cause of action for fraud, parol evidence rule is not bar to showing fraud despite general disclaimer in contract).

The Defendants have established that they were fraudulently induced through Lobato, as to the terms and conditions of the Notes and, therefore, the Notes are unenforceable.

*The Waiver, Hold Harmless And Release Language Found In The Promissory Notes And Borrowers Letters Are Unenforceable*

■ The Notes executed by the Defendants contained a provision on the second page stating:

Bank and each Borrower and indorser, in any litigation (whether or not relating to Obligations) in which Bank and any of them shall be adverse parties, ... and each Borrower and indorser waives the right to interpose any set-off or counterclaim of any nature or description.

In addition, the "Investment Knowledge" paragraph found on the second page of the Borrowers Letter states:

I agree to hold the Bank harmless and do hereby release the Bank from any and all claims that I may have relating to or arising out of my investment.

However, neither the Promissory Notes nor Borrowers Letters contain a "merger clause," and the Borrowers Letters contain no prohibition against an oral modification.

The Defendants may maintain all of their claims against First City based on the holding in *Parnes v. Mast Property Investors, Inc.*, 776 F.Supp. 792 (S.D.N.Y.1991), wherein it was stated:

In New York, a party does not waive his or her right to bring a late legal action for fraud if that party had no knowledge of the alleged fraud at the time the release was signed. See *Rockwood Computer Corp. v. Morris*, 94 F.R.D. 64, 68 (E.D.N.Y.1982) (under New York law, "it is clear that if the plaintiff had no knowledge of the defendant's fraud when it entered into the release, the existence of the release would not insulate the defendant from liability on the plaintiff's claim for breach of fiduciary duty") (and cases cited).

776 F.Supp. at 799.

■ Under New York law, a release or waiver clause may be attacked and set aside, even if it is clear on its face, for substantive flaws in its execution, such as fraud in the inducement, illegality, duress, or mutual mistake. *See Barrett v. United States*, 660 F.Supp. 1291, 1309 (S.D.N.Y. 1987); *Omaha Indem. Co. v. Johnson & Towers, Inc.*, 599 F.Supp. 215, 291 (S.D.N.Y.1984); *du Pont v. Perot*, 59 F.R.D. 404, 410 (S.D.N.Y.1973); *Skluth v. United Merchants & Mfrs., Inc.*, 163 A.D.2d 104, 559 N.Y.S.2d 280, 283 (1st Dep't 1990); *Goldsmith v. National Con-tainer Corp.*, 287 N.Y. 438, 442–43, 40 N.E.2d 242 (1942).

■ A plaintiff or counterclaimant must establish five distinct elements of fraud to set aside a release or waiver:

1) there was a misrepresentation or active wrongful concealment of a material fact;

2) the representation was in fact false and was known to be at the time it was made or the concealment was intentional;

3) the misrepresentation was made for the purpose of inducing plaintiff to rely on it or the concealment was done to mislead the plaintiff;

4) plaintiff did, in fact, rely on the misrepresentation or she would have acted differently had she known of the concealment; and

5) plaintiff was caused injury as a proximate result of the misrepresentation or concealment.

*Barrett*, 660 F.Supp. at 1309.

■ However, once a plaintiff or counterclaimant has put into the record at least "some evidence" showing there has been fraud, duress, or some other fact that is sufficient to void the release, the party asserting the release as a defense must come forward with "real evidence" to sustain its burden regarding the legality of the release on pain of suffering a directed verdict. *See Fleming v. Ponziani*, 24 N.Y.2d 105, 111, 299 N.Y.S.2d 134, 140, 247 N.E.2d 114, 118 (1969). The party asserting the release as a defense must prove by a preponderance of the evidence that the release was valid at its inception, and this burden does not shift at any time during the case: JVAA had the burden of persuading the Court in its role as fact-finder that the Defendants, when they signed the release, knew the legal effect of their acts and intended the release to cover the injuries they now counterclaim on as falling within the release's scope. *See id.*, 24 N.Y.2d at 112–113, 299 N.Y.S.2d at 141, 247 N.E.2d at 120.

Thus, despite the similarities in the Notes and waiver clauses at issue here and in *Joint Venture Asset Acquisition v.*

*Bhogaonker,* 769 F.Supp. 532, 537 (S.D.N.Y.1991), the outcomes of the two cases are distinctly different: The clauses are set aside here, while they were enforced in *Joint Venture.* This divergence of outcomes is readily explained by the difference in the evidence offered by the parties in the two cases. In *Joint Venture,* this Court held that the notes were enforceable because "[t]he Defendants have not established that the Bank ever misled them about any of the terms and conditions of the Notes," *id.* at 536; and that the waiver clauses were valid because "[a]t trial the Defendants offered no evidence that they did not understand the implications of this waiver when they signed the Borrower's Letters," *id.* at 537.

In the matter at hand, the Defendants not only established the fraudulent inducement by the Plaintiffs but also offered extensive and unchallenged evidence that they did not understand the waiver clauses and had no knowledge of the significance of the "Investment Knowledge" paragraph at the time they signed the Borrowers Letters. Therefore, under New York state law, the waiver clause is not valid. *See Generale Bank, New York Branch v. Choudhury,* 779 F.Supp. 306, 309–10 (S.D.N.Y.1991); *Thornock,* 749 F.Supp. at 519; *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 94–95, 495 N.Y.S.2d 309, 311, 485 N.E.2d 974, 976 (1985); *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 321, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959); *First City Nat'l Bank & Trust Co. v. Heaton,* 165 A.D.2d 710, 563 N.Y.S.2d 783 (1st Dep't 1990); *First City Nat'l Bank & Trust Co. v. Tobias,* 156 A.D.2d 267, 548 N.Y.S.2d 655 (1st Dep't 1989); *Seaman–Andwall Corp. v. Wright Machine Corp.,* 31 A.D.2d 136, 295 N.Y.S.2d 752 (1st Dep't 1968), *aff'd,* 29 N.Y.2d 617, 324 N.Y.S.2d 410, 273 N.E.2d 138 (1971).

The Defendants have shouldered their burden of proof by establishing each of the requisite elements of fraud by a clear preponderance of the evidence, *see Barrett,* 660 F.Supp. at 1309, and by demonstrating a lack of understanding regarding the terms and conditions of the waiver clause, *see Thornock,* 749 F.Supp. at 519. The

Plaintiffs, however, have failed to discharge their corresponding burden of persuasion of showing the validity of the release from its inception and the knowledge of the Defendants regarding the scope and nature of the waiver clause.

 In addition, the principle of equitable estoppel bars the use of the waiver clause. Application of equitable estoppel rests on notions of essential fairness and sound discretion of court, *Indyk v. Habib Bank, Ltd.,* 694 F.2d 54 (2d Cir.1982); the doctrine is invoked · successfully against a party who has occasioned a loss through an obvious lack of care or an affirmative act fairly identified as the cause of the loss. *See Hammelburger v. Foursome Inn Corp.,* 54 N.Y.2d 580, 446 N.Y.S.2d 917, 431 N.E.2d 278 (1981). Such is the case here.

### Conclusion

The amended complaint is dismissed with costs to the Defendants. Submit judgment on notice.

It is so ordered.