DAVID GERSTEIN, Respondent, v 532 BROAD HOLLOW ROAD COMPANY, Appellant.

First Department, June 24, 1980

**APPEARANCES OF COUNSEL**

*Paul A. Feigenbaum* of counsel *(Charles H. Miller* with him

on the brief; *Marshall, Bratter, Greene, Allison & Tucker,* attorneys), for appellant.

*Stacy L. Wallach* of counsel *(Edward L. Sadowsky* and *Martha E. Cohen* with him on the brief; *Tenzer, Greenblatt, Fallon & Kaplan,* attorneys), for respondent.

### OPINION OF THE COURT

BLOOM, J.

This is a proceeding brought under the "Simplified procedure for court determination of disputes" (CPLR 3031 *et seq.).* The facts agreed to and the proof adduced at the hearing establish that Lear-Siegler, Inc. (Lear) entered into a lease effective June 1, 1966 covering the premises located at 532 Broad Hollow Road, Melville, Suffolk County, New York. As subsequently amended the lease was for a period of 23 years and 6 months with two renewal options, each for a period of 10 years.

In many respects the building was unique. It was built under the personal direction of plaintifff Gerstein, who was then president of Lear's Data and Controls Division, for specialized use in connection with Lear's electronics business. The manner of the building's construction made it valuable to those capable of utilizing its special qualities.

Toward the end of 1969 Gerstein was informed that Lear intended to close down its New York division and to transfer those operations to California. At that time the unexpired term of the lease, taken together with the two renewal options, had approximately 40 years to run. Gerstein, who had met Edmund Abramson in another connection, suggested to him that the lease would be a valuable acquisition. Abramson was a member of a partnership consisting of himself, Goodson and Todman. The partnership acquired the lease from Lear effective December 31, 1969.

Gerstein's special knowledge of the buildings attributes and his familiarity with those to whom those qualities would be desirable became an almost indispensable part of the deal. Accordingly, on the same day as the lease was acquired, an agreement was entered into between the partnership and Gerstein in which he agreed to make available to the partnership his "knowledge and experience * * * concerning the property". Inasmuch as performance of the duties undertaken by Gerstein required that he leave the employ of Lear, he was

given "a twenty-five (25%) interest in the 'Net Cash Receipts' to be derived by the [partnership] from the operation of the premises" without making any cash contribution therefor. Net cash receipts was defined as any income derived from the operation of the building less the fixed annual rental, real estate taxes and assessments and reasonable operating expenses which did not include administrative, executive, bookkeeping and brokerage expenses. Additional provisions were included which, under specified circumstances, would increase or decrease the net cash receipts. In the event the partnership decided to sell the lease Gerstein was given the right of first refusal, a right which he was required to accept or reject within 30 days. In the event of a sale of the lease to a third party, Gerstein was to receive 25% of the proceeds over $400,000, which represented a recapture of the price paid by the partnership to Lear for the assignment.

In June, 1972 the partnership acquired fee title to the property in the name of defendant, 532 Broad Hollow Company (Company). On June 30, 1972 the 1969 agreement between Gerstein and the partnership was canceled and a new agreement was entered between Gerstein and the Company. So far as the operation of the premises was concerned it paralleled the old agreement. However, because of the additional sums expended by the Company in acquiring the fee, it included new provisions for distribution of any sums realized on a sale of the premises. It provided first for a recapture of the capital outlay by the Company. This was fixed at $1,464,500, plus the costs of certain structural repairs and capital improvements. Twenty five percent of any sum in excess of that amount was to be paid to Gerstein subject, however, to the proviso that Gerstein's percentage interest was to be reduced by one and one-half percent for each calendar year until December 31, 2005. On and after January 1, 2006, Gerstein's interest was to be limited to 10% of the sale price in excess of the capital investment to be recaptured by the Company. The contract, like the agreement of December 31, 1969, gave Gerstein the right of first refusal in the event of a proposed sale, which was required to be exercised within 30 days of the offer. In the event the parties failed to reach agreement on the terms of the proposed sale within the 30-day period, the Company was free for the next six months to sell the building on the open market provided that the terms of sale were not less favorable than those offered to Gerstein. Other provisions not here material were included.

By letter dated March 20, 1977, Gerstein was informed that the Company had entered into a contract to sell the property to Pangloss Properties, Inc. (Pangloss). A copy of the contract, which was enclosed, fixed the sales price at $1,586,431 and indicated that the closing would be held on April 12, 1977. While the contract did not so reflect, it is conceded that, in addition to the price specified in the contract to sell, Pangloss had assumed a liability of the Company in the sum of $187,-500 arising out of commissions due to real estate brokers in connection with prior unrelated leasing transactions. These sums had already been earned by United Realty and Williams, the two brokers involved, but were payable *in futuro* as the rents were paid by the lessees.

Gerstein responded to this information by letter dated March 31, 1977, asserting a breach of the 1972 agreement because he had been denied the right of first refusal. This was followed by a letter to Pangloss from Gerstein's lawyers, dated April 4, 1977, informing it that by reason of the Company's failure to first offer the property to Gerstein it was "not in a position to convey title to you free of Mr. Gerstein's claims". After some brief negotiations Gerstein agreed to waive his right of first refusal in return for the inclusion of the $187,500 in the purchase price. A letter dated April 6, 1977 to that effect was delivered to Gerstein and, accordingly, his claim to the right of first refusal was waived.

When the Company refused to pay Gerstein the moneys claimed by him as his share of the proceeds of the sale this proceeding was instituted. The Company has interposed three defenses and two counterclaims. The first two defenses allege that the services performed by Gerstein under the 1969 and 1972 agreements were brokerage services; that Gerstein was not licensed to perform brokerage services as required by law and, by consequence, he is barred from recovering for such services. The third defense alleges duress. The first counterclaim alleges that from 1971 to 1975 the Company paid to Gerstein the sum of $101,256.98 under the 1969 and 1972 agreements; that these sums were paid for brokerage services which Gerstein was not licensed to perform and that, by reason thereof, the Company is entitled to recoup these payments. The second counterclaim seeks recovery of a penalty in an amount not less than $101,256.98 nor more than $405,027.92 for the performance of unlicensed brokerage ser-

vices, pursuant to subdivision 3 of section 442-e of the Real Property Law.

Two basic issues are posed by the Company. The first is the claim that Gerstein acted as a real estate broker without being licensed to do so. The second is the charge of duress. We shall treat with them seriatim.

So far as may here be pertinent subdivision 1 of section 440 of the Real Property Law defines "real estate broker" as one "who, for another and for a fee, commission or other valuable consideration * * * sells * * * or rents * * * an estate or interest in real estate". He is "an agent who, for a commission or brokerage fee, bargains or carries on negotiations in behalf of his principal as an intermediary between the latter and third persons in transacting business relative to the acquisition of" real property (6 NY Jur, Brokers, § 1). While he is an agent, he is one "of a peculiar kind. He acts as an intermediary between two parties in bringing about a contractual meeting of minds" *(Polo v Lordi,* 261 NY 221, 224). By statute (Real Property Law, § 440-a) a real estate broker is required to be licensed. Absent such a license, recovery of compensation for brokerage services is barred (Real Property Law, § 442-d; *Sorice v DuBois,* 25 AD2d 521; *Enfeld v Hemmerdinger Estate Corp.,* 34 AD2d 980; *Reed v Watson,* 244 App Div 522).

■ Necessarily, therefore, analysis of Gerstein's role in the initial transaction between Goodson, Todman and Abramson on the one hand and Lear on the other and his further role in the operation of the premises are mandated. As to the initial transaction, it is plain that he did not act as broker. While his discussions with Abramson were sufficient to arouse Abramson's interest in the lease, there is nothing to indicate that he played any role in negotiating the terms or conditions of the assignment of the lease. Indeed, conclusive on this subject is the paragraph in the supplemental agreement between Lear and Goodson, Todman and Abramson, dated December 31, 1969 in which they represent that "they have at all times dealt directly with each other and that no broker brought about the assignment of the said lease and no broker is entitled to any commission in connection with the assignment of said lease".

It is equally clear that Gerstein did not act as broker in letting the premises once Goodson, Todman and Abramson took over the Lear lease. The December 31, 1969 agreement between Gerstein and the partnership demonstrates that the

partnership was bargaining for Gerstein's knowledge and experience in connection with the premsies. For the partnership to obtain Gerstein's expertise it would be required to compensate him for giving up his position as president of Lear's Data and Controls Division. For that reason the partnership gave him a 25% interest in the "Net Cash Receipt" and a 25% interest in the proceeds of sale over and above the sum necessary to recapture its original investment. To make doubly clear that the services to be rendered by Gerstein did not include brokerage services, that agreement provided that the reasonable expenses of brokers was one of the items to be deducted in computing "Net Cash Receipts". This latter provision was carried over into the agreement of June 30, 1972.

In these circumstances, we conclude that the trial court properly held that Gerstein did not act as broker in the negotiations between Lear and the partnership at the time of the assignment of the lease by Lear to the partnership, nor did he act in that capacity in the lettings first by the partnership and then by the Company to the tenants who thereafter leased portions of the premises. Accordingly, it properly dismissed the first two affirmative defenses and the two counterclaims.

We come next to the issue raised by the third affirmative defense, that of duress. Duress, generally speaking, may be said to exist where one is compelled to perform an act which he has the legal right to abstain from performing. The compulsion must be such as to overcome the exercise of free will (17 NY Jur, Duress and Undue Influence, § 1). It must "involve an act or a threat of action from which the person sought to be influenced is entitled to be free" (*Kazaras v Manufacturers Trust Co.,* 4 AD2d 227, 237, affd 4 NY2d 930). A threat to do that which one has the right to do does not constitute duress (*Bachorik v Allied Control Co.,* 34 AD2d 940; *Oleet v Pennsylvania Exch. Bank,* 285 App Div 411).

Here, Gerstein was granted, by agreement, the right of first refusal. The Company entered into a contract to sell without offering the premsies to him. In so doing it breached its agreement. We need not decide whether the failure to do so constituted such a cloud as to prevent the Company from conveying title to Pangloss free and clear of Gerstein's claim. It is sufficient for our purposes to note that by his letter of March 31, 1977 to the Company and his letter of April 4, 1977 Gerstein did no more than assert the right conferred upon

him by the 1969 and 1972 agreements. In sum, he asserted a claim which, under the law, he was entitled to assert. The Company recognized this in its letter to him of April 6 when it assured him that his share of the sale proceeds would be calculated on a total purchase price of $1,773,931.99. In consequence of this commitment Gerstein waived his right under the agreement. Hence, the trial court properly dismissed the third affirmative defense.

There remains one matter to be disposed of. The brokerage fee payable by the Company on the sale of the property to Pangloss was $15,000. This was properly deductible as an item of the expense of the sale. Gerstein's interest in the proceeds of the sale was reduced by 1½% for each year that the agreement was in effect. Since the judgment failed to include this proper deduction we modify accordingly.

The judgment of the Supreme Court, New York County (HELMAN, J.) entered October 23, 1979, should be modified, on the facts, by reducing the amount awarded to $67,277.71, with interest thereon from May 27, 1977 and, as so modified, affirmed, without costs.

FEIN, J. P., SULLIVAN, LUPIANO and SILVERMAN, JJ., concur.

Judgment, Supreme Court, New York County, entered on October 23, 1979, modified, on the facts, by reducing the amount awarded to $67,277.71, with interest thereon from May 27, 1977, and, as so modified, affirmed, without costs and without disbursements.

Settle order.