MARK MERGLER et al., Respondents, v CRYSTAL PROPERTIES ASSOCIATES, LTD., et al., Defendants, and O'DONNELL, FOX & GARTNER, P. C., et al., Appellants.

First Department, April 14, 1992

### APPEARANCES OF COUNSEL

*Robert D. Lillienstein* of counsel *(Liebman, Charme & Oppenheimer,* attorneys), for appellants.

*David Bruce Karel* of counsel *(Mark L. Friedman* with him on the brief; *Wilkofsky, Friedman, Karel & Cummins,* attorneys), for respondents.

### OPINION OF THE COURT

SULLIVAN, J. P.

In the absence of fraud, duress, illegality or mistake, a general release bars an action on any cause of action arising prior to its execution. Since plaintiffs have executed such a release herein and none of the foregoing infirmities has been shown, defendants' motion should be granted and the complaint dismissed.

Plaintiff Mark Mergler, a dentist, and his wife, also a plaintiff herein, retained the defendant law firm to represent them in connection with the purchase of certain Long Island City, New York, commercial realty, which plaintiff intended to use as a dentist's office. Jay Fox, also a defendant herein and member of the defendant law firm, handled the matter for the firm. One week after the December 22, 1988 closing, the law firm submitted a bill for $3,916, representing the agreed-upon fee and out-of-pocket expenses, to plaintiffs, who refused to

pay, allegedly because the law firm "failed to advise [plaintiff] of a method of reducing [his] overall closing costs, including various recording and mortgage taxes."

On March 31, 1989, after a number of conversations about the law firm's alleged "malpractice" in which plaintiff persisted in refusing to pay its bill, the law firm commenced an action, seeking, in its first cause of action $7,200 on a theory of quantum meruit and, in its second, $3,916 on a theory of account stated. One month later, after further discussions during which plaintiff reiterated his allegations of malpractice, the parties agreed to settle the action by plaintiffs' payment of the full amount of the law firm's bill, $3,916, and an exchange of general releases.

The general release from plaintiffs to the law firm, executed on May 4, 1989, more than four months after the firm's legal work had been completed, released "all * * * claims, and demands whatsoever" that plaintiffs "ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or bring whatsoever from the beginning of the world to the day of the date of this RELEASE." The consideration therefor was recited as $1. On June 22, 1989, the law firm executed a reciprocal release in plaintiffs' favor, reciting as the consideration therefor $3,916. Upon receipt of the executed release and plaintiffs' certified check for $3,916, the law firm discontinued its action.

Six months later, on or about November 8, 1989, plaintiffs commenced the instant action, asserting three causes of action, the first against the seller of the Long Island City property and the other two against the law firm defendants. In the second cause of action alleging legal malpractice, plaintiffs assert that defendants represented to them that the certificate of occupancy permitted use of the premises as an office building although this was not the case and that defendants failed to advise them that closing costs could have been reduced by obtaining financing for the premises; in the third cause of action, they allege that the same acts constitute a breach of the oral retainer agreement.

Defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (5), asserting the bar of the general release. In their submissions defendants asserted that they made clear to plaintiff the necessity of either amending the present certificate of occupancy or replacing it and that, in either event, an architect would have to be retained to draw

plans and specifications as part of any application for a new or amended certificate. The IAS court, apparently converting the motion into one for summary judgment pursuant to CPLR 3211 (c), requested additional affidavits addressed to the question of whether plaintiffs had discussed their claims of attorney malpractice with anyone before the release was signed. Upon receipt of same, the court denied the motion, concluding that, even though the release was executed and delivered after the attorney-client relationship had terminated, a question of fact remained as to whether plaintiffs "knowingly and voluntarily signed away their legal malpractice claim when they executed the general release." The court also determined that defendants had the burden of proving that the release was fair and free from fraud. By so ruling, the court impermissibly shifted the burden of proof from plaintiffs to defendants.

Pursuant to General Obligations Law § 15-303, a written instrument which purports to be "a total or partial release of all claims, debts, demands or obligations", such as the general release involved here, is valid even in the absence of consideration. *(Zullo Lbr. v New York City Hous. Auth.,* 48 AD2d 453, 456.) Since a release " 'is a jural act of high significance without which the settlement of disputes would be rendered all but impossible[,] * * * the traditional bases for setting aside written agreements, namely, duress, illegality, fraud or mutual mistake, must be established or else [it] stands.' " *(Touloumis v Chalem,* 156 AD2d 230, 231-232, quoting *Mangini v McClurg,* 24 NY2d 556, 563.)

In denying summary judgment, the IAS court found an issue of fact as to whether plaintiffs knowingly and voluntarily waived their malpractice claim in signing the general release. Since it is not a prerequisite to the enforceability of a release that the releasor be subjectively aware of the precise claim he or she is releasing, lack of such knowledge does not preclude summary judgment. In *G.S.C. Holding Corp. v Cervoni* (69 AD2d 809), the court, in enforcing a release and dismissing a cause of action for conversion, rejected the releasor's claim of lack of knowledge of the conversion at the time of execution of the release. The court held, "Although plaintiff asserts that it did not learn of the alleged conversion until after it executed the release it does not allege fraud on the part of defendants. Consequently, it is bound by the release". *(Supra,* at 810.) Plaintiffs make the same argument, i.e., that they were unaware of some of their claims when they signed the release, and it should be similarly rejected.

The court also erred in placing the burden of proving the propriety of the release on defendants, instead of requiring plaintiffs, who seek to avoid it, to show otherwise. In so doing, the court relied on a series of cases, stemming from *Whitehead v Kennedy* (69 NY 462, 466), holding that an attorney who contracts with his or her client during the course of the attorney-client relationship must establish affirmatively that the agreement is in every respect free from fraud on the attorney's part. That principle, and thus the line of cases relied upon, has no application to agreements made, as here, after the attorney-client relationship has terminated. Nor is there any justification for extending the principle to such agreements.

This court's decision in *Matter of O'Hara* (85 AD2d 669) is directly on point. There, the court upheld a general release given by a client to her lawyers after the attorney-client relationship had ended and granted summary judgment dismissing the client's fraud and malpractice claims, holding, "In the absence of a fiduciary relationship between the parties to the release, the party seeking to avoid the release bears the burden of proving * * * fraud or other vitiating circumstances." *(Supra,* at 671.)

The elements of a fraud claim are well known. They are a material misrepresentation of fact, made with knowledge of its falsity, with the intent to deceive, justifiable reliance and damages. *(Channel Master Corp. v Aluminium Ltd. Sales,* 4 NY2d 403, 406-407; *Lanzi v Brooks,* 54 AD2d 1057, 1058, *affd* 43 NY2d 778.)* In the instant matter, the only factual allegation of record that can be characterized as a claim of fraud is plaintiff's assertion that between the December 22, 1988 closing and May 4, 1989 release execution he "spoke with members and associates of [the defendant] firm, including one Kenneth Bloom, who urged me to sign the release in question after informing me that I did not have a valid claim against the firm."

For a variety of reasons, this allegation is deficient. As a statement of opinion, it is not a representation of material fact and, thus, cannot support a claim of fraud. *(See, Lanzi v Brooks, supra,* at 1059.) Even if such a statement could be considered as a representation of fact, and even if, arguendo, it be false, there is no allegation, much less any "specific and detailed" evidence in the record, to support such an allegation, i.e., that Bloom knew his statement to be false when made.

*(Matter of O'Hara, supra,* at 671.) Finally, there is no showing in the record that plaintiffs were justified in relying on Bloom's statement *(see, e.g., Dunkin' Donuts v Liberatore,* 138 AD2d 559), which, as is acknowledged, was made after the attorney-client relationship had terminated, at a time when they and the law firm were adversaries in a lawsuit over legal fees.*

Finally and, in any event, under the IAS court's own reasoning, those portions of the two causes of action involving the alleged overpayment of mortgage recording taxes and closing costs should have been dismissed. The court ruled that the release could not be enforced without proof that plaintiffs "knowingly and voluntarily signed away their legal malpractice claim." The record is clear that plaintiffs were fully aware, at the time they executed the release, of the existence of that aspect of their claim. They had used that claim as justification for their refusal to pay the law firm's bill. As already noted, however, whether plaintiffs were subjectively aware of all their present claims at the time they signed the release is irrelevant. All of the facts giving rise to those claims were in existence at the time and they make no assertion that defendants in any way attempted to conceal them. Plaintiffs have shown neither fraud nor mutual mistake.

While it is true, as plaintiffs argue, that attorneys have a continuing confidential relationship of trust and fair dealing which survives the termination of the attorney-client relationship, they are unable to cite any case that suggests that a contract entered into after such termination is presumptively void unless the attorney affirmatively shows that it is fair to the client and fraud-free on his or her part. In both *Radin v Opperman* (64 AD2d 820) and *Greene v Greene* (56 NY2d 86), upon which they rely, the acts complained of occurred during the existence of the attorney-client relationship. In *Pomona Enters. v Mellen* (30 AD2d 704), also relied upon, the propriety of an attorney's assignment of his claim for fees to a corporation of which he subsequently became an officer was at issue. Thus, the court's statement regarding the relationship of trust and fair dealing has nothing to do with the enforceability of any agreement between the attorney and client but rather

---

* Bloom states, and plaintiffs do not deny, that plaintiff told him that he had consulted an attorney and believed he had "a good legal malpractice case" against the law firm, which, if true, makes any claimed reliance on Bloom's statement even less justified.

with its concern about the circumstances surrounding the claim assignment insofar as they bear on the issue of whether any client confidences had been compromised.

Plaintiffs are finally left to argue that the release should not be enforced because they were not specifically told that they should seek independent legal advice. In that regard, an attorney should not, by contract or other means, without first advising the person that independent representation is appropriate in connection therewith, seek to settle a malpractice claim against the attorney with an unrepresented client or former client. (Code of Professional Responsibility DR 6-102 [A].) There is no showing in this record that defendants advised plaintiffs before execution of the release that with respect to such instrument they had a right to independent counsel. That particular requirement of DR 6-102 (A), however, did not go into effect until September 1, 1990, after the events in issue, and, while its principle is self-evident and represents a standard of ethical conduct, it is not applicable here. In any event, the Code of Professional Responsibility was promulgated to establish an ethical standard and to vindicate society's rights with respect to the conduct of licensed attorneys, not to delineate substantive rules for the adjudication of the private rights, *inter se,* of parties.

Moreover, as defendants point out, it is apparent that plaintiff, sophisticated and educated, had to appreciate, upon being served with a summons and complaint naming him as a defendant, that it was advisable to contact an attorney. In fact, as noted, defendants allege, and it is not denied, that plaintiff told them that "he had consulted with numerous attorneys and they informed *[sic]* that because of the situation with regard to the financing, as well as with regard to the certificate of occupancy he had a good legal malpractice case." According to Kenneth Bloom, a member of the firm, he told plaintiff "in no uncertain terms clearly and unequivocally that if he believed that he had a claim of malpractice or any other defense to the action he was welcome to obtain the services of any of the attorney friends who had informed him that he had such a good case, and pursue his claim." On another occasion, plaintiff advised Bloom that he "had discussed the entire matter with an attorney who had informed him that our *quantum meruit* claim constituted a form of harassment and that in his as well as his advisors' opinion we should resolve the dispute by taking one-half the invoiced amount as our fee." After a final conversation in which Bloom

told plaintiff that he had two choices, either pay the bill or, personally or through counsel, appear in and answer the law firm's action, the parties, without issue ever being joined, settled their dispute by plaintiffs' payment of the full amount of the bill and an exchange of releases. In such circumstances, even if DR 6-102 (A), with respect to its requirement as regards a lawyer's obligation to a former client, were applicable, dismissal should not be denied merely because defendants did not formally advise plaintiffs that they had a right to independent counsel with respect to the execution of their release.

Accordingly, the order of the Supreme Court, New York County (Kristin Booth Glen, J.), entered September 6, 1990, denying defendants' motion to dismiss the complaint on the ground of release, should be reversed, on the law, without costs or disbursements, and the motion granted.

MILONAS, KUPFERMAN, ASCH and KASSAL, JJ., concur.

Order of the Supreme Court, New York County, entered September 6, 1990, denying defendants' motion to dismiss the complaint on the ground of release, is reversed, on the law, without costs or disbursements, and the motion granted.