DuFORT, Plaintiff,

v.

**AETNA LIFE INSURANCE CO., et al., Defendants.**

**No. 92 Civ. 1699 (LJF).**

United States District Court, S.D. New York.

March 30, 1993.

Mark Friedman, Wilkofsky, Friedman, Karel & Cummins, New York City, for plaintiff.

Bryan R. Williams, DeForest & Duer, New York City, for defendants.

## MEMORANDUM & OPINION

FREEH, District Judge.

In this action, plaintiff Harvey DuFort ("DuFort") claims that by refusing to pay the full amount due under his disability policy, defendants Aetna Life Insurance Company ("Aetna") and its employee, Robert Feury ("Feury"),[1] breached the terms of the policy, acted in bad faith, and intentionally inflicted emotional distress upon him. Defendants now move for summary judgment on the grounds that all of DuFort's claims are barred by the March 1989 release signed as part of DuFort's settlement agreement with Aetna. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

In June 1986, DuFort, a former salesman for Matthew Bender & Co., Inc. ("Matthew Bender"), filed a claim for total disability benefits under his disability policy with Aetna, claiming that a back condition prevented him from working. Aetna commenced payments under the policy. In January 1987, however, DuFort was examined on Aetna's behalf by Dr. Irving Etkind, who determined that DuFort was not totally disabled within the meaning of the policy.[2] (Williams Decl.

---

1. DuFort also names as a defendant Mutual of Omaha Insurance Co., Aetna's successor in interest.

2. The Aetna disability policy defined "total disability" as "the inability of the Insured to per-

form the duties of the Insured's regular occupation, except that after a Monthly Benefit for continuous disability has been payable for 24 months, then during the continuance of disability, Total Disability means the inability of the Insured to work in any gainful occupation for

Ex. D). Aetna also received information from Matthew Bender that DuFort's employment had ended for reasons other than disability. Accordingly, Aetna discontinued DuFort's benefits as of January 12, 1987. (Williams Decl.Ex. E).

Between June 1986 and August 1988, DuFort submitted numerous physicians' statements to Aetna, in an effort to convince Aetna that his back condition did in fact qualify as a total disability under the policy. (Williams Decl.Ex. H–1—5). DuFort also provided Aetna with a letter dated March 14, 1988 from the division of the company handling his medical claim, which stated that DuFort was totally disabled. (Williams Decl. Ex. I).

In response to DuFort's submissions, Aetna wrote him several times, stating that it would reconsider DuFort's claim if he would provide information concerning his employment and would submit to a second medical examination. (Williams Decl.Exs. F, G, J and K). There is no evidence in the record indicating any response by DuFort to these requests. Feury also contacted DuFort by telephone and made an offer to settle DuFort's claim for $25,000, but DuFort declined that offer. Instead, in December 1988, DuFort contacted the New York State Insurance Department to complain about Aetna's handling of his claim. (Williams Decl.Ex. L).

On or about March 3, 1989, Feury again contacted DuFort by telephone. The parties dispute what happened during that conversation. DuFort alleges that Feury offered him $102,000 on a "take it or leave it basis," not allowing DuFort even a few days in which to consider the offer. DuFort also claims that Feury told him, "we are going to make this thing drag ... and if you go to court, it will take years to be resolved, and from what I understand, from where you live and what I know about you, you will become homeless and hungry." (Friedman Aff.Ex. 1 at 51–53).

Feury denies making any of those statements and claims that it was DuFort who proposed the $102,000 settlement. (Williams Decl.Ex. W–2—W–6). Neither party disputes, however, that as a result of the March 3, 1989 discussion, Aetna and DuFort agreed to settle DuFort's claim for a lump sum payment of $102,000. (Williams Decl.Ex. N).

As part of the settlement, on March 16, 1989, DuFort executed a general release which provided that DuFort and his

> heirs, executors, administrators, successors, and assigns release, acquit and forever discharge [the] AETNA LIFE INSURANCE COMPANY and its agents, servants and employees, and all other persons, firms, corporations, associations or partnerships of, and from, any and all claims, actions, causes of action, demands, damages, costs and expenses and compensation whatsoever, which the undersigned now has or may hereafter accrue on account of or in any way growing out of any and all claims under Individual Disability Policy NCX 4858, which policy was issued to HARVEY DUFORT by said AETNA LIFE INSURANCE COMPANY on June 26, 1979. Said Policy NCX 4858 is hereby surrendered for cancellation.
>
> [ (Williams Decl.Ex. P) ].

Approximately three to six days after signing the release, DuFort alleges that he called Aetna's office twice in order to request that the agreement be cancelled. Aetna refused that request. (Friedman Aff.Ex. 1 at 112–114). DuFort subsequently picked up and spent the settlement funds.

Since February 1989, DuFort has been receiving treatment from a psychiatrist, Dr. Martin Hurwitz ("Hurwitz"). Hurwitz has diagnosed DuFort as a psychotic depressive and has stated in his deposition testimony that this condition prevents DuFort from exercising reasoned judgment in business matters. (Friedman Aff.Ex. 8 at 7). According to Hurwitz, DuFort has been in this condition since at least November 1988, although there are periods of time where his judgment and comprehension fluctuate markedly. (*Id.* at 57).

Hurwitz further testified that he had an appointment with DuFort on March 16, 1989, the date that the release was signed. On

---

which the Insured is reasonably suited by reason of education, training and experience, with due regard for vocation and economic status when disability began." (Williams Decl.Ex. A at 3).

that day, DuFort was "[u]nstable, agitated, disheveled" and suicidal. (*Id.* at 32).

Although DuFort claims to have been mentally incompetent throughout his relationship with Aetna, he concedes that he never specifically informed Aetna of that condition. Rather, during their March 1989 conversation, DuFort merely told Feury in that he was "very, very sick." (Friedman Aff.Ex. 1 at 86).

Defendants move for summary judgment on the grounds that the March 1989 release precludes all of DuFort's claims here. DuFort opposes the motion and claims that the release is not binding because he signed it while under economic duress and while mentally incompetent.

## DISCUSSION

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." In determining motions for summary judgment, the Court does not resolve disputed issues of fact, but simply assesses whether any such issues exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While the mere existence of some factual dispute will not preclude the entry of summary judgment, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," summary judgment is not appropriate. *Id.* at 248, 106 S.Ct. at 2510.

In determining whether disputed issues of material fact exist, the Court must view the evidence in the light most favorable to the party opposing the motion—in this case, DuFort. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, once a motion for summary judgment has been made, the non-moving party cannot simply rely on conclusory allegations. Rather, the party opposing the motion "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. *See also Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355 (the non-moving party "must do more than simply

show that there is some metaphysical doubt as to the material facts").

■ It is well established in New York that "'a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties.'" *Skluth v. United Merchants & Manufacturers, Inc.*, 163 A.D.2d 104, 559 N.Y.S.2d 280, 282 (1st Dept.1990) (*quoting Appel v. Ford Motor Company*, 111 A.D.2d 731, 490 N.Y.S.2d 228, 229 (2d Dept.1985)). Thus, a release will be binding on the parties absent a showing of fraud, duress, undue influence, or some other valid legal defense. *Skluth*, 559 N.Y.S.2d at 282 (*citing Fleming v. Ponziani*, 24 N.Y.2d 105, 299 N.Y.S.2d 134, 247 N.E.2d 114 (1969)). *See also Mergler v. Crystal Properties Assoc.*, 179 A.D.2d 177, 583 N.Y.S.2d 229, 232 (1st Dept.1992) ("Since a release 'is a jural act of high significance without which the settlement of disputes would be rendered all but impossible[,] ... the traditional bases for setting aside written agreements, namely, duress, illegality, fraud or mutual mistake, must be established or else [it] stands.'") (*quoting Mangini v. McClurg*, 24 N.Y.2d 556, 301 N.Y.S.2d 508, 249 N.E.2d 386 (1969)).

### 1. Economic Duress

■ DuFort claims that the March 1989 release is not binding because he signed that release as a result of economic duress. While claims of economic duress frequently involve factual issues which cannot be resolved by summary judgment, DuFort has failed to raise any question of fact as to an essential element of this defense. *See, e.g., Nelson v. Stanley Blacker, Inc.*, 713 F.Supp. 107, 110 (S.D.N.Y.1989) (rejecting plaintiff's duress claim as a matter of law and entering summary judgment in favor of defendant even while acknowledging that duress claim "usually requires a determination of a party's state of mind which would preclude summary judgment"). Accordingly, defendants are entitled to judgment as a matter of law on that claim.

In order to make out a claim for economic duress, DuFort must establish that the re-

lease was obtained "(1) by means of a wrongful threat precluding the exercise of free will; (2) under the press of financial circumstances; (3) where circumstances permitted no other alternative." *Nelson,* 713 F.Supp. at 110 (citations omitted); *Stewart M. Muller Construction Co. v. New York Telephone Co.,* 40 N.Y.2d 955, 390 N.Y.S.2d 817, 359 N.E.2d 328 (1976); *See Austin Instrument, Inc. v. Loral Corporation,* 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971).

■ New York courts have interpreted the first of these elements, a wrongful threat precluding the exercise of free will, fairly strictly, and have held that "[a] threat to do that which one has the right to do does not constitute duress." *Gerstein v. 532 Broad Hollow Road Co.,* 75 A.D.2d 292, 429 N.Y.S.2d 195, 199 (1st Dept.1980); *Harrison v. Grobe,* 790 F.Supp. 443, 454 (S.D.N.Y. 1992). The party seeking to avoid an otherwise valid contract on duress grounds cannot simply claim that the other party threatened to breach their agreement. *See Orix Credit Alliance, Inc. v. Hanover,* 182 A.D.2d 419, 582 N.Y.S.2d 153, 154 (1st Dept.1992) ("A mere threat by one party to a contract to breach it by not delivering required items, indeed, financial or business pressure of all kinds, even if exerted in the context of unequal bargaining power, does not constitute economic duress."); *Weinraub v. International Banknote Co.,* 422 F.Supp. 856, 859 (S.D.N.Y.1976) ("[m]ere hard bargaining positions, if lawful, and the press of financial circumstances, *not caused by the defendant,* will not be deemed duress") (emphasis added).

■ A party raising duress must also do more than merely claim that the other party knew about and used his or her poor financial condition to obtain an advantage in contract negotiations. *See Kenneth D. Laub & Co. v. Domansky,* 172 A.D.2d 289, 568 N.Y.S.2d 601, 602 (1st Dept.1991) ("That plaintiff knew defendant was in financial straits when demanding commission[s] amounts to no more than mere hard bargain-

ing tactics."). Rather, in order to prevail on a duress claim, the plaintiff must show that the defendant's actions "deprived [him] of [his] free will," and that "the ordinary remedy of an action for a breach of contract would not be adequate." *Austin,* 324 N.Y.S.2d at 26, 272 N.E.2d 533.

DuFort cannot do so here. Even assuming, as the Court must, that DuFort's account of his March 3, 1989 conversation with Feury is true, Feury's statements amount to no more than a threat to defend vigorously Aetna's position that it had no liability under the disability policy. DuFort had been examined by a licensed physician who declared that he was not "totally disabled" within the meaning of Aetna's policy. Thus, Aetna had no clear legal obligation to make any payment to DuFort. While Aetna may have lost had DuFort sued for breach of the policy, under the circumstances, a legitimate dispute existed as to DuFort's disability and Aetna made no "wrongful threat" by defending its position in that dispute.[3]

In the Court's view, Feury's statement that DuFort "[would] become homeless and hungry" if he did not settle with Aetna was unnecessarily harsh. However, the legal question is whether that statement constituted a "wrongful threat" as a matter of law. It is undisputed that Aetna was not the cause of DuFort's financial problems. Thus, Feury's statement amounts to no more than a prediction or dramatization of DuFort's hardship, not a threat to impose such a hardship.

The situation here is not unlike that in *Stewart M. Muller Const. Co. v. New York Telephone Co.,* 50 A.D.2d 580, 374 N.Y.S.2d 353, 355 (2d Dept.1975), *aff'd,* 40 N.Y.2d 955, 390 N.Y.S.2d 817, 359 N.E.2d 328 (1976). In that case, the parties entered an agreement pursuant to which the plaintiff was to construct a building for the defendant. When a dispute arose between the parties, the defendant threatened to terminate the construction agreement, knowing that such termination would result in the plaintiff's "economic collapse." In order to avoid that outcome,

---

**3.** The fact that another division of Aetna found that DuFort was disabled does not alter this conclusion. While evidence of this contradictory finding might have undermined Aetna's position at a trial of DuFort's breach of contract claim, it did not obligate Aetna to pay DuFort benefits under the disability policy.

the plaintiff entered a settlement agreement with the defendant which modified the terms of their earlier contract. Twenty months later, the plaintiff filed an action to void the settlement agreement on duress grounds.

The trial court denied the defendant's motion to dismiss plaintiff's claims. The Appellate Division reversed, and held that the plaintiff had failed to establish duress as a matter of law. According to the court, "[d]efendant's threat ... related to a relevant and legitimate dispute which stemmed from the contract itself. The fact that plaintiff[ ] may have been financially constrained to accept less than the true value of their alleged damages does not constitute economic duress." 374 N.Y.S.2d at 355. *See also Muller*, 390 N.Y.S.2d at 817, 359 N.E.2d 328 (given contract's express termination provision, "there is no possibility that the plaintiff could present evidence which would establish that defendant's threatened cancellation was in excess of its contractual rights and, hence, was wrongful").

This case is distinguishable from *Muller* because DuFort alleges mental incapacity as well as economic duress. If DuFort was mentally incompetent at the time he spoke with Feury in March 1989, he could have perceived Feury's statements as threats rather than hard bargaining tactics. However, DuFort has not cited—and the Court has not located—any New York case holding that the existence of a wrongful threat is determined by the alleged incompetent's subjective perceptions. To the contrary, it appears that the existence of a wrongful threat must be evaluated under an objective standard. *See Harrison*, 790 F.Supp. at 455 (analyzing alleged duress under objective standard, even where plaintiff had alleged mental incompetence). As a result, DuFort cannot rely on his alleged mental incompetence to support his duress claims.

2. *Mental Incompetence*

■ DuFort contends that the release is voidable because at the time he signed that agreement, he was mentally incompetent to do so. In New York, capacity to contract is presumed. The party asserting incompetence must prove that status "at the time

of the disputed transaction, ... an extremely heavy [burden]." *Harrison*, 790 F.Supp. at 447 (*citing Feiden v. Feiden*, 151 A.D.2d 889, 542 N.Y.S.2d 860, 862 (3d Dept.1989)). DuFort must also show that Aetna knew or should have known of his condition. *Ortelere v. Teachers Retirement Board of the City of New York*, 25 N.Y.2d 196, 303 N.Y.S.2d 362, 369–70, 250 N.E.2d 460 (1969).

■ The parties dispute whether DuFort was in fact incompetent to contract at the time he signed the release on March 16, 1989. It is undisputed, however, that Aetna did not know and had no reason to know about DuFort's alleged mental condition. In fact, at his deposition, DuFort conceded that he never told Feury or any other Aetna employee that he was depressed or otherwise mentally incapacitated. According to DuFort, he merely told Feury that he was "very, very sick" and not feeling well, statements that were consistent with his claim of total physical disability. Nothing in the record suggests that, by his conduct or statements, DuFort put Aetna on notice of a potential mental incapacity. As a result, the Court finds that Aetna did not know and should not have known of DuFort's alleged mental condition.

■ In *Ortelere*, however, the New York Court of Appeals recognized that, under certain limited circumstances, a contract may be voided even if one party had no reason to know of the other's mental incompetence. Quoting the Restatement 2d of Contracts, the Court stated that "[w]hen ... the other party is without knowledge of the contractor's mental illness and the agreement is made on fair terms ... [t]he power of avoidance ... terminates to the extent that the contract has been so performed in whole or in part or the circumstances have so changed that avoidance would be inequitable. In such a case a court may grant relief on such equitable terms as the situation requires." 303 N.Y.S.2d at 369–70, 250 N.E.2d 460. *See, e.g., Pentinen v. New York State Employees' Retirement System*, 60 A.D.2d 366, 401 N.Y.S.2d 587, 588 (3d Dept.1978) (noting that in retirement system cases, courts have allowed rescission of contracts despite lack of knowledge regarding mental incompetency

584

where "there was proof that the [defendant] would not be prejudiced or that avoidance would not be inequitable").

DuFort argues that this Court should exercise its equitable powers to set aside the 1989 release despite Aetna's lack of knowledge regarding his condition and despite the fact that the contract has been fully performed.[4] (Opposition at 9–10). However, given the factual dispute regarding DuFort's actual mental condition at the time the release was signed and DuFort's heavy burden on this issue, the Court cannot do so at this time.[5] *See, e.g., McNorton v. Bronx Psychiatric Center,* 151 A.D.2d 448, 542 N.Y.S.2d 646, 649 (1st Dept.1989) (hearing required where parties dispute mental capacity at time of contract signing). A hearing will therefore be held on *April 22, 1993 at 10:00 a.m.* regarding DuFort's mental condition on March 16, 1989. Fed.R.Civ.P. 43(e). If appropriate, defendants may renew their motion for summary judgment following that hearing.

For the foregoing reasons, defendants' motion is granted in part and denied in part.

SO ORDERED.

4. Defendants argue that DuFort's inability to pay back the $102,000 settlement fund and restore the status quo precludes rescission of the release. (Motion at 19–20). However, none of the cases cited by defendants involved a claim of mental incompetence. Moreover, the restoration requirement does not necessarily apply to every case. *Williams v. Macchio,* 69 Misc.2d 94, 329 N.Y.S.2d 405, 409 (Supreme Court, Queens Cty., 1972). While it is clear that "[h]e who seeks equity must do equity," *Holdeen v. Rinaldo,* 28 A.D.2d 947, 281 N.Y.S.2d 657, 661 (1967), the involvement of an allegedly incompetent person such as DuFort changes the equity analysis. Accordingly, DuFort's inability to repay the settlement funds is not dispositive.

5. DuFort's psychiatrist did testify during his deposition that DuFort suffers from a mental condition which prevented him from exercising reasoned judgment or understanding the "nature of

a surrender of an insurance policy." (Friedman Aff.Ex. 8 at 52). That doctor also indicated DuFort's condition went beyond mere depression into psychosis. (*Id.* at 26–27). *See Ortelere,* 303 N.Y.S.2d at 370, 250 N.E.2d 460 ("[N]othing less serious than medically classified psychosis should suffice or else few contracts would be invulnerable to some kind of psychological attack."); *Blatt v. Manhattan Medical Group, P.C.,* 131 A.D.2d 48, 519 N.Y.S.2d 973, 974 (1987) (depression alone not sufficient basis to set aside otherwise valid contract). However, the record does not clearly indicate whether DuFort was psychotic or suffering some other condition at the time he signed the release on March 19, 1989. Given DuFort's heavy burden on this issue, *Harrison,* 790 F.Supp. at 447, the Court cannot find that DuFort was mentally incompetent as a matter of law, and cannot rely on that incompetence to set aside the release.