**SKYLON CORPORATION, Plaintiff,**

v.

**GUILFORD MILLS, INC. and George Greenberg, Defendants.**

No. 93 Civ. 5581 (LAP).

United States District Court, S.D. New York.

Sept. 30, 1994.

---

**354**

Lawrence M. Klepner, Klepner & Cayea, New York City, for plaintiff.

Peter Gruenberger, Weil, Gotshal & Manges, New York City, for defendants.

## OPINION & ORDER

PRESKA, District Judge:

Plaintiff brings this action alleging two instances of fraud on the part of the defendants and seeking rescission or invalidation of a release which otherwise bars certain of its claims. Defendants have moved for summary judgment on the basis of the release, which I find to be enforceable. Accordingly, defendants' motion is granted with respect to the claims falling within the scope of the release and denied with respect to those falling without.

### Background [1]

In June 1985, Guilford Mills, Inc. ("Guilford"), a well-established textile company, entered into a contract with Northfield Creations and Designs Ltd., Inc ("Northfield"), a company owned and controlled by Seymour and Richard Schlam. Under the agreement, Northfield undertook, *inter alia,* to manufacture finished garments using Guilford fabrics. Northfield would sell the garments to various retail customers, and profits would be shared equally by Northfield and Guilford.

In order to provide financing for the arrangement, Northfield entered into a factoring agreement with Rosenthal & Rosenthal, Inc. ("Rosenthal"). Factoring is a type of financial arrangement whereby a business sells or transfers title to its accounts receivable to a factoring company which then acts as principal. The receivables are sold without recourse, so the factoring company cannot turn to the seller if they prove uncollectible. In light of this fact, Rosenthal insisted that Guilford guarantee Northfield's obligations under the factoring agreement.

On or about August 10, 1988, Rosenthal advised Guilford of its suspicion that Northfield had factored approximately $1.8 million

---

**1.** Since I am considering defendants' motion for summary judgment, the facts below are either undisputed or related in the manner most favorable to the plaintiff.

dollars in fraudulent accounts receivable by submitting invoices for orders that either had been canceled or had never been received. About one week later, Guilford executives confronted the Schlams with the accusation, and the Schlams admitted that they had perpetrated the fraud. Guilford informed the Schlams that it intended to sever their business relationship. Seymour Schlam, however, replied that if Guilford were to do that, Northfield would go out of business, leaving Guilford with no way to recover either the $1.8 million it was obligated to pay Rosenthal (pursuant to Guilford's guarantee of the factoring agreement) or the $6 million it was owed by Northfield for fabric and interest.

Having no desire to cut off its proverbial nose to spite its proverbial face, Guilford decided not to bring Northfield down. At the same time, however, it was unwilling to risk further damage by pouring more money into the company. Instead, Guilford began working with Northfield to find another entity to take over Guilford's role in the Guilford–Northfield arrangement. If another company could be found to provide fabric and financing to Northfield, Northfield would be able to remain in business, and more importantly, would be able to continue generating income to pay its debt to Guilford.[2]

In the fall of 1988, Guilford and Northfield found their "patsy." Defendant Greenberg, then President and a director of Guilford, approached Irving Schuyler of Skylon Corporation about having Skylon replace Guilford in the Guilford–Northfield arrangement. In order to induce Skylon to make such a move, Greenberg made no mention of Northfield's recent fraudulent conduct. In addition, Greenberg made the following fraudulent representations:

- Guilford would provide continuous financing to Northfield subsequent to Skylon's involvement.
- Greenberg would participate personally in the Skylon–Northfield arrangement and would invest $500,000.

- Greenberg would obtain additional financing for the Skylon–Northfield arrangement from other sources.
- Guilford and Rosenthal had been carefully monitoring Northfield's financial affairs and such affairs were in order.
- There was no risk that Northfield could misappropriate funds paid by retailers for finished garments because all such funds were paid directly to Rosenthal.

In reliance upon Greenberg's pitch, Skylon agreed to commence a relationship with Northfield and began providing that company fabric and financing.

As with the Guilford–Northfield arrangement, the Skylon–Northfield arrangement required a factoring company. Irving Schuyler requested Guilford to assist in arranging for Rosenthal to play that part. In view of Northfield's recent fraud, Rosenthal conditioned its involvement on Guilford's willingness to guarantee the Skylon–Northfield accounts. Guilford agreed to do so after securing Skylon's agreement to indemnify it for any losses sustained as a result of the guarantee. Skylon was not aware of the reason why Rosenthal had insisted on the guarantee from Guilford.

The result of all these machinations was that by the end of 1988, the Skylon–Northfield arrangement was in place and operating. Unfortunately, Northfield also continued operating its fraudulent schemes. In or about December 1989, Rosenthal demanded payment from Guilford, as guarantor, for approximately $770,000 of non-collectible Skylon–Northfield accounts. Several weeks later, Guilford reported to Skylon that an audit of Northfield had disclosed that nearly $1.5 million of Northfield's $1.8 million in accounts receivable were past due. The parties concluded that Northfield was generating fraudulent receivables and decided to take steps to protect their interests.

In mid-February 1990, Skylon and Guilford filed separate, but parallel, actions

---

**2.** The facts related in this paragraph, and the several following, are hotly disputed by defendants. As noted above, however, in this summary judgment context, I must adopt plaintiff's version of disputed events. Defendants concede

that there is an issue of fact as to whether they defrauded Skylon into replacing Guilford as Northfield's victim. Defendants' Memorandum of Law in Support of Motion for Summary Judgment at 2 n. 2.

against Northfield in New Jersey state court.[3] Skylon's complaint alleged that it had maintained a business relationship with Northfield since 1986, and that Northfield, during the period from 1987 into 1990, had engaged in a pattern of fraud, thievery, and deceit, which Skylon had discovered in 1989. Guilford's complaint also alleged a pattern of fraud by Northfield conducted during the period from 1988 into 1990. In paragraphs 10 and 11, it made reference to the August 1988 fraud involving the $1.8 million dollars worth of fraudulent invoices. It further averred that Guilford had been contemporaneously aware of this conduct.

While the two New Jersey actions against Northfield were proceeding, Guilford decided to satisfy its obligations to Rosenthal under its guarantee of the Skylon–Northfield accounts. Accordingly, it paid Rosenthal the approximately $770,000 Rosenthal had demanded the previous December and promptly demanded reimbursement of that sum from Skylon under Skylon's indemnity agreement. Thereafter, Skylon and Guilford began negotiations to settle Guilford's indemnity claim, as well as all other matters between the parties relating to their relationships with Northfield. The negotiations eventually resulted in an agreement between Skylon and Guilford, dated September 24, 1990, among the terms of which was a general mutual release, providing that

> [e]xcept for enforcement of the terms of this Agreement, each of the parties hereby mutually covenants and agrees that each is hereby released and forever discharged from any and all claims against the other. Skylon hereby covenants and agrees that it hereby releases [Guilford CEO] Chuck Hayes from any and all claims which Skylon may have against him, except for the terms of this agreement. Guilford also hereby covenants and agrees that it hereby releases Irving Schuyler and Harvey Schuyler from any and all claims which Guilford may have against them.

Oberlies Aff., Exh 1 at ¶ 15.

Skylon filed this action in August 1993. The complaint alleges that by the various

misrepresentations described above and by failing to disclose their knowledge of Northfield's fraudulent behavior, Greenberg and Guilford fraudulently induced Skylon into (1) participating in the Skylon–Northfield arrangement; (2) agreeing to indemnify Guilford for losses resulting from its guarantee of the Skylon–Northfield account with Rosenthal; and (3) agreeing to the release provision in the September 1990 settlement agreement. The result of these frauds, plaintiff maintains, was that Skylon Corporation was put in a position to be drained and destroyed, and in fact was drained and destroyed, by the wrongful conduct of Northfield. Accordingly, plaintiff maintains, it is entitled to recision of the release provision in the September 1990 settlement agreement and at least $28 million in compensatory and punitive damages. The defendants have moved for summary judgment on the grounds that all of these claims are barred by the September 1990 release.

*Discussion*

As defendants recognize, the fate of this motion turns on the September 1990 release. If valid, the release bars claims within its scope, and summary judgment on those claims must be entered in favor of defendants. If invalid, I must examine the merits of plaintiff's fraud claims, which defendants concede are rife with factual issues preventing summary judgment. Preliminarily, I must determine the scope of the release, both in terms of which parties it protects and which claims it bars. Then, I will consider whether the release is enforceable.

**I. The Scope of the Release.**

 Under New York law, a release, like any other contractual provision must be construed in accordance with the intent of the parties who executed it. *Stone v. National Bank and Trust Co.*, 188 A.D.2d 865, 591 N.Y.S.2d 609 (3d Dept.1992). Where the intent of the parties is not clear from the face of the release itself, a court is presented with

---

**3.** *Skylon v. Northfield,* No. ESX–L–2623–90 (N.J.Super.Ct.) and *Guilford v. Northfield,* No.

ESX–L–2625–90 (N.J.Super.Ct.)

an issue of fact not properly resolved on summary judgment. *Stanfill Plumbing & Heating Corp. v. Dravo Constructors, Inc.,* 191 A.D.2d 187, 594 N.Y.S.2d 191 (1st Dept. 1993); *Goldstein v. City of New York,* 159 A.D.2d 313, 552 N.Y.S.2d 594 (1st Dept.1990).

### A. Whom Does the Release Cover?

■ There is no question that Guilford is covered by the September 1990 release. An issue exists, however, as to whether defendant Greenberg is also protected. By its express terms, the release covers Skylon, Guilford, Chuck Hayes, Irving Schuyler, and Harvey Schuyler. Defendant Greenberg is not mentioned. Nevertheless, Greenberg contends that he is included in the release, which, he says, was intended to be plenary. Skylon, on the other hand, maintains that only those individuals to whom the release expressly alludes were intended to be protected.

As noted immediately above, the parties' disagreement as to their intent with respect to Greenberg presents an issue for decision by the trier of fact. Defendants advance several arguments as to why the Court should assume the parties to have intended to release Greenberg. None of them, however, is persuasive enough to overcome the facts that 1) the release does name specific individuals and 2) Greenberg is not among them. In view of those circumstances, which raise the substantial possibility that Greenberg's omission from the release was not merely an oversight, I simply cannot hold as a matter of law that the parties intended Greenberg to be released.[4]

Defendants also argue that any issue of the parties intent concerning Greenberg is not material because, as a matter of law, Skylon's release of Guilford operated to release all of Guilford's agents, including Greenberg, who was Guilford's president. As authority for this proposition, defendants rely upon the case of *International Halliwell Mines, Ltd. v. Continental Copper & Steel Industries, Inc.,* 544 F.2d 105, 109 (2d Cir. 1976), wherein the Court of Appeals did indeed state that "New York law is well settled that the release of one wrongdoer releases all those who acted as its agents, absent an express reservation to the contrary." The Court went on, however, to state that the rationale underlying this rule was "the prevention of double recovery where the alleged wrongful acts of several individuals cause a single injury." *Id.* The fear was that an injured party would settle his or her claims with the principal and then sue the agent in Court, enabling the injured to reap a total recovery in excess of the amount of his or her damages. *See Gavin v. Malherbe,* 146 Misc. 51, 261 N.Y.S. 373, 375–76 (N.Y.Sup.Ct. 1932).

As reflected in Section 15–108 of its General Obligations law, New York no longer prevents double recoveries by construing releases to extend beyond their intended scope.[5] Instead, releases are interpreted to cover only those stated to be covered, and double recoveries are avoided by reducing an injured party's claims against non-released liable parties by amounts received in settlement from released liable parties. *See Tufail v. Hionas,* 156 A.D.2d 670, 549 N.Y.S.2d 436 (2d Dept.1989) (applying § 15–108 and holding that release given to automobile owner did not release driver from liability for injuries sustained by passenger). Thus, Skylon's release of Guilford does not extend to Greenberg as a matter of law, and the factual issue concerning the parties' intent with respect to

---

**4.** I also note that the parties chose not to employ the language so frequently used in New York to the effect that a release runs to the corporation, "its officers, directors, employees and agents, past and present."

**5.** Section 15–108 provides:
(a) Effect of release of or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons claimed to be liable in tort for the same injury, ... it does not discharge any of the other tortfeasors from liability for the injury ... unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipuleted (sic) by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

N.Y.Gen.Oblig.Law § 15–108 (McKinney 1989).

his status under the release is material and does prevent summary judgment for Greenberg.

### B. Which Claims Does the Release Cover?

"When, as here, a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if 'the language of the release is clear ... the intent of the parties [is] indicated by the language employed.'." *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir.1977) (quoting *In re Schaefer*, 18 N.Y.2d 314, 317, 274 N.Y.S.2d 869, 872, 221 N.E.2d 538, 540 (1966)).

■ The release at issue here is clearly written. It provides that each party is discharged "from any and all claims against the other." There is no reason to believe that the parties intended that language to mean anything other than what it says, a conclusion buttressed by the fact that in the course of arguing this motion, both sides have assumed that the release covered all of plaintiff's claims. Accordingly, I find that if effective, the release bars all claims between the parties accruing before the date of the release, including those contained in Skylon's instant complaint. *See Matter of O'Hara*, 85 A.D.2d 669, 445 N.Y.S.2d 201, 204 (2d Dept. 1981) (valid general release bars suit on any cause of action arising prior to the date of its execution). *See also Generale Bank, New York Branch v. Wassel*, 779 F.Supp. 310, 319 (S.D.N.Y.1991) (applying New York law; general release executed without knowledge of claim for fraud bars claim nonetheless).

### II. The Enforceability of the Release.

■ This holding, of course, begs the question of whether the release is effective. "It is well established in New York that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a

private agreement between parties. Thus, a release will be binding on the parties absent a showing of fraud, duress, undue influence, or some other valid legal defense." *DuFort v. Aetna Life Ins. Co.*, 818 F.Supp. 578 (S.D.N.Y.1993) (internal quotations and citations omitted). Moreover, in the absence of a fiduciary relationship, a party seeking to avoid an otherwise valid release has the burden to prove vitiating circumstances. *Matter of O'Hara*, 445 N.Y.S.2d at 204.[6]

■ Skylon claims that the release here is invalid because it was fraudulently procured. Specifically, Skylon alleges (and on summary judgment I assume) that at the time the parties negotiated the release, Guilford wrongfully concealed the fact that it had known of Northfield's fraudulent behavior when recruiting Skylon into the Skylon–Northfield arrangement. This fact was material, it asserts, because had Skylon known the information, it would not have granted the release but instead would have prosecuted Guilford for fraudulently inducing it into the arrangement (as it now seeks to do in Count I of its complaint).

■ Fraudulent concealment will vitiate a release under New York law. *See Mergler v. Crystal Properties Associates, Ltd.*, 179 A.D.2d 177, 583 N.Y.S.2d 229 (1st Dept.1992); *Skluth v. United Merchants & Mfrs., Inc.*, 559 N.Y.S.2d 280 (1st Dept.1990). However, one who seeks to avoid a release on that basis must establish the basic elements of fraud:

1) the other party wrongfully misrepresented or concealed a material fact;

2) the misrepresentation was false and known to be false when made, or the concealment was intentional;

3) the misrepresentation was made, or the concealment was done, with the intent of inducing reliance;

4) the plaintiff did in fact rely and was reasonable in doing so.

---

**6.** Although Skylon half-heartedly argues that Skylon and Guilford were fiduciaries with respect to their dealings with Northfield, it presents no authority in support of extending the

fiduciary concept to sophisticated corporations engaged in type of sophisticated arms-length transactions at issue here.

*Joint Venture Asset Acquisition v. Zellner,* 808 F.Supp. 289, 302 (S.D.N.Y.1992).[7]

Accepting Skylon's contention that it relied on Guilford's omission of its prior knowledge of Northfield's fraud in signing the release,[8] the documents in this case demonstrate that, as a matter of law, such reliance was not reasonable and is therefore insufficient to base a claim. *See Atlantic Welding Services, Inc v. Westchester Steel Fabricators Corp.,* 173 A.D.2d 1073, 570 N.Y.S.2d 410 (3d Dept. 1991) (dismissing fraud claim where victim's reliance was unjustified).

The key document is Guilford's 1990 complaint against Northfield. The allegations of that complaint explicitly set forth the facts that Northfield had defrauded Guilford in 1988 and, more importantly, that Guilford had learned of that fraud in August of that year, that is, prior to the consummation of the Northfield–Guilford–Skylon arrangements. These disclosures were amplified in the supporting affidavit of Guilford executive Douglas Knowlton, which set forth in more detail the circumstances of the 1988 fraud and Guilford's discovery of it in 1988.

The significance of the Guilford complaint and the Knowlton affadivit cannot ·be overstated. Had Skylon read either document, it would have learned that Guilford knew of Northfield's fraudulent behavior at the time it brought Skylon into business with Northfield. Prior to assenting to the release, in other words, Skylon would have known the very fact it now claims was concealed by Guilford. Its "reliance" on Guilford's later failure to disclose the fact would have been unreasonable as a matter of law, and its claim that its assent to the release was induced by fraud would fail. *See Hotel Con-*

structors, *Inc. v. Seagrave Corp.,* 574 F.Supp. 384, 390 (S.D.N.Y.1983) (where a party has "complete and true knowledge of the facts supposedly misrepresented" it has no grounds for claiming fraud).

Skylon argues that it is not chargeable with knowledge of the facts contained in the Guilford complaint or the Knowlton affidavit because it never ·read them. In light of Harvey Schuyler's sworn statement to that effect, I must accept the assertion as true. Nevertheless, Skylon's ignorance does not save its claim. The law of New York is that if one "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of [an omission], he must make use of those means, or he will not be heard to complain that he was induced" by fraud. *Keywell Corporation v. Weinstein,* 33 F.3d 159, 164 (2d Cir.1994) (quoting *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80–81 (2d Cir.1980). *See also Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir. 1983) (ready access to the truth is tantamount to knowledge of the truth). Accordingly, Skylon, which had access to the "truth" through publicly filed, publicly available court documents, of which it was aware and simply neglected to read, cannot defeat summary judgment by brandishing its failure to inform itself.[9]

Skylon attempts to rebut the caselaw holding that access to the truth bars reliance by citing other New York cases to the effect that "a plaintiff who has failed to conduct an investigation [may] nevertheless maintain an action for fraud when it can demonstrate reasonable reliance on specific misrepresentations which induced [it] not to investigate

7. Technically speaking, the party must also demonstrate injury proximately caused by its reliance. In the context of a fraudulently induced release, however, the injury requirement will be satisfied by the fact that the release bars the party from asserting claims that would otherwise be available.

8. Linguistically, it is perhaps not possible to rely on an omission. In the legal sense, however, a party "relies" on an omission when it would have acted differently had it known the concealed information.

9. Skylon maintains that the mere filing of pleadings in a state court is not enough to place the

world at large on constructive notice of matters discussed therein. This position, though seemingly reasonable, is inapposite here. For it is beyond dispute that Skylon was aware of the filing of the Guilford complaint. In view of that fact, my holding today that the Guilford complaint barred reasonable reliance by Skylon should not be interpreted as charging Skylon with knowledge of every document filed in the New Jersey Superior Court. Rather, I reach the much more limited conclusion that Skylon may be held accountable for failing to read pleadings it concededly knew existed.

**360**

into matters in which he otherwise might have." Plaintiff's Supplemental Memorandum of Law on the Issue of Constructive Notice in Further Support of its' Opposition to Defendants' Motion for Summary Judgment at 1. This statement of the law is accurate, *see* 60 N.Y.Jur.2d § 153 (1987), and would be helpful to Skylon if it could demonstrate some effort on Guilford's part to prevent or dissuade Skylon from reading the Guilford complaint or the Knowlton affidavit. However, no such effort is averred in Skylon's complaint here, nor is any cited in Skylon's supporting affidavits or memoranda. Skylon's caselaw, therefore, is of no relevance to present circumstances.

Finally, Skylon is unable to argue persuasively that its failure to read the Guilford complaint and Knowlton affidavit (and therefore its reliance) was reasonable notwithstanding the lack of malevolent efforts by Guilford. Skylon alleges that it "would have been beyond reason for Skylon to somehow wonder or deduce ... that Guilford's lawsuit against Northfield contained additional claims relating to points in time including 1988 and earlier." Plaintiff's Supplemental Memorandum at 1. Its own 1990 complaint against Northfield, however, alleged that Northfield's fraudulent activities extended back to January 1, 1987. Thus, Skylon should have considered that Guilford, which Skylon knew had done business with Northfield during the latter half of the 1980s, might have discussed the same time period in its Northfield suit. At the very least, Skylon should have expended the minimal effort required to simply read the Guilford complaint prior to taking the serious step of releasing Guilford from all claims relating to Northfield. Its failure to do so was patently unreasonable and does not vitiate the release.

Accordingly, I find Skylon legally unable to claim fraudulent inducement with respect to the release and therefore bound by its terms. The release bars Skylon's claims against Guilford, so Guilford's motion for summary judgment must be granted.

*Conclusion*

Defendants' motion for summary judgment is DENIED with respect to Greenberg and GRANTED with respect to Guilford. Defendants motion for Rule 11 sanctions is DENIED.[10]

The remaining parties shall appear for a conference on November 1, 1994 at 4:30 p.m.

10. The thrust of defendants' motion for sanctions is that plaintiff's complaint was frivolous in light of "incontrovertible" evidence that plaintiff was aware of Northfield's fraudulent conduct prior to signing the release. Insofar as the release was in favor of Guilford, however, Skylon's prior awareness of Northfield's conduct is not germane. Rather, the validity of the release turns on Skylon's pre-release awareness of Guilford's conduct—specifically, on whether Skylon had reason to know of the fraud Guilford allegedly perpetrated by failing to inform Skylon of Northfield's fraudulent conduct prior to bringing Skylon into

the Skylon–Northfield arrangement. Above, of course, I have held that the Guildford complaint and the Knowlton affidavit did put Skylon on notice of Guilford's alleged fraud so as to make the release of that claim enforceable. Nonetheless, the issue of whether the New Jersey pleadings constituted sufficient notice was neither so one-sided nor illusory as to support a finding that plaintiff's complaint was brought in bad faith, for vexatious purpose, or without appropriate investigation. Accordingly, Rule 11 sanctions are not appropriate.